RUSSIAN ORTHODOX ALL SAINTS CHURCH v. DARIN.

1. RELIGIOUS SOCIETIES—VOLUNTARY ASSOCIATIONS—INCORPORATION CURES DEFECTIVE TITLE TO REAL ESTATE IN UNINCORPORATED ASSOCIATION.
     Although an unincorporated voluntary religious society could not hold title to real estate in its own name, where such society has taken title and later complies with the provisions of 3 Comp. Laws 1915, § 11784, and becomes incorporated. the defect is remedied and the title becomes valid.

2. SAME— CORPORATION HOLDS PROPERTY IN TRUST FOR ALL ITS MEMBERS.
     Where the members of an unincorporated religious

association became divided on political questions and contested for supremacy and control of its temporal affairs and property, but there were no serious religious differences, and the majority of the members took the proper legal steps to become incorporated, the corporation succeeded to the temporalities of the society in trust for the religious purposes and uses for which they had been procured and dedicated by that society and in which every member of both factions has a beneficial interest.

3. SAME — EQUITY MAY REQUIRE HONEST ELECTION BEFORE DECREEING RELIEF TO A CORPORATION.
Although the society has become incorporated, and the corporation is therefore entitled to the possession of its property and to an accounting by the minority members who have controlled its affairs since the division, it is within the power of a court of equity to withhold such relief until an honest corporate election has been held on the basis of the membership as it existed at the time of the division, and the decree of the court below ordering an election and an accounting is modified accordingly, and the case remanded.

Appeal from Wayne; Collingwood (Charles B.), J., presiding.   Submitted June 8, 1922.   (Docket No. 47.)   Decided March 22, 1923.

Bill by the Russian Orthodox All Saints Church against Dimitri Darin and others for an injunction. From a decree for plaintiff defendants appeal. Modified and affirmed.

*Walter M. Nelson* (*Solomon G. Paperno* and *Harry L. Diehl*, of counsel), for plaintiff.

*Samuel L. Jones* (*Ernest N. Pappas*, of counsel), for defendants.

STEERE, J.  Prior to the year 1914 members of a colony of Russians in the northeasterly part of Detroit formed an organization in the nature of a voluntary unincorporated religious association.  They were all members of the Orthodox Greek Church and

most of them spoke only the Russian language. They
were unfamiliar with or indifferent to procedure in
this country for legal organization and incorporation
of church entities and pursued their own peculiar
practice. It appears to be conceded that they organ-
ized as a parish of the Russian Orthodox Greek
Church according to its recognized methods, under the
auspices of the American hierarchy, and submitted
themselves to its jurisdiction in matters of religious
faith and ecclesiastical discipline. They later procured
a place of worship and home for a pastor by purchas-
ing from the Asbury Methodist Episcopal Church of
Detroit two lots located at the southeastern corner of
Joseph Campau and Hendrie avenues upon which was
a church building. Although the purchasing society
was unincorporated the deed to the property, dated
March 16, 1917, runs from the grantor named to the
"Russian Orthodox All Saints Church, a corporation
created by the laws of Michigan, of the same place."

Some time following their organization a committee
representing them asked of the proper church author-
ities and were given a priest to minister to their
spiritual wants. After this property was thus se-
cured, services were regularly held in their church,
according to the doctrines and liturgy of the Russian
Orthodox Greek Catholic Church, and the customary
church activities were conducted there under an or-
dained resident priest of the faith who was installed
in the pastor's residence adjoining. Church records
were kept, written by the secretary of the society in
the Russian language in books procured for that pur-
pose and usually deposited in the church building. In
them were entered minutes of business meetings of
the parish, committee meetings, baptisms, marriages,
funerals, etc. Amongst the records was also kept
a book containing a list of the members of the church,
or parish.

Father Isidore Salko was the first priest assigned to and accepted by this parish. He was not entirely in accord with some of the regulations of the local organization relative to its temporal affairs, including his compensation, and left in about a year. He was followed by three others in succession, the last being Father Dimitri Darin, one of the defendants in this case, who became pastor of the church in August, 1918, and continued to act in that capacity up to the time of the hearing, though plaintiffs contend he was deposed by action of the majority of the church members some time before.

The members of this association increased and it apparently prospered harmoniously until after outbreak of the revolutions in Russia which overthrew the empire and resulted in the assassination of its czar, who was recognized as the head of the Russian church, with the American hierarchy of which this congregation was affiliated. Thereafter discussions and dissensions arose amongst the members which gave rise to a division resulting in this and other litigation.

So closely were the institutions and interests of the Russian church interwoven with those of the Russian empire, that the fall of the latter left the affairs of the former in a sadly disturbed and chaotic condition, which apparently yet prevails. Those matters, which are stressed at length in the conflicting contentions of the parties, throw more light on the causes than or the solution of this litigation, though perhaps helpful to the extent they may indicate the political views of the contending parties on Russian governmental affairs and the consequential effect on their attitude towards submission to the temporal if not spiritual government of the Russian Greek church, to which, however, in its religious aspect, plaintiff's members claim spiritual loyalty as faithful members in full

harmony with the confession of faith, discipline and rules of said church under the "jurisdiction of the administration of the hierarchy of the Russian Orthodox Church of North America."

The differences in this congregation were in their inception over Russian political matters as to which they were first aroused by the so-called Kerensky revolution in 1917.    So far as shown this revolution was not directly antagonistic to the religious tenets of the church, as such, although it deposed the czar who was its temporal head.    The majority of the members of this organization were in sympathy with the revolution, while the clergy of the Russian church generally and naturally remained loyal to the czar, the fall of whose empire destroyed all governmental relations of state and church.    Although it is indicated the czar was regarded by the mass of lay members and even some of the clergy as also the spiritual head of the church, his connection with it according to its catechism was only as "administrator and protector," confined to administering its temporal affairs as a state church, without clerical rank or control over ecclesiastical questions of faith, dogma, or discipline.    Whatever his influence and aid in the temporal affairs might have been, he seems to have only ranked at the altar with the laity.    But, be that as it may, the troubles in this parish, originating in extreme differences over governmental disturbances in Russia, had become so acute that certain of its members were led by their sympathies with the revolution to become, for the time being, at least, followers of an atheistic revolutionary leader of that country called Lenine, whose picture with that of a socialist agitator named Debs adorned the walls of a building not far from the church in which that cult was accustomed to gather, called the "Russian National Home."

This national home was procured by the Russians in that community in 1916 before any of these church dissensions arose, and apparently was harmoniously used by people of that nationality as a social center and general place of meeting. There is evidence that it was favorably looked upon and patronized by members of the church who, from the beginning, held some of their general congregational business meetings of the parish there, because the basement of the church was too small to accommodate the entire membership. After the revolution broke out in Russia it seems to have become a place of assembly for discussion of Russian political issues and activities. At the time of this trial Father Darin described it as a "Bolsheviki hall" or place where the "radical element" gathered.

When the United States entered the World War and took steps to register alien enemies, the attitude and propaganda against this government of many of the Russians who met in that building attracted the attention of Federal authorities to it, and, amongst others, some 40 or more members of the church were arrested with a view to their deportation, but afterwards released under bonds. While the records do not make clear that any of them were deported by the government, it does appear that quite a number of them deported themselves.

Father Darin came to this church as its priest in troublous times. Though evidently conscientious and faithful in his priestly duties, it is obvious that he was not in sympathy with the political views on Russian affairs of the majority of his parishioners. Raised and educated in this country, he spoke both the English and Russian languages fluently. Finding him a competent and reliable interpreter, the Federal authorities at times employed him as such. His services to the government in that capacity seem

to have inspired the accusation by some of his parishioners that he furnished the information which led to their arrest, of which, there is no evidence and which he positively denied.   The records of the parish show numerous more or less inharmonious meetings of its members were held in the latter part of 1918 and early in 1919, the last in which the unquestioned officers of the church organization and both factions participated being the annual meeting held on January 5, 1919.   The record of that meeting shows the election of a president, treasurer, secretary and eleven "members of the committee."   Makari Skurko, a former secretary, but not during the preceding year, was unanimously elected secretary for the succeeding year.   Amongst other entries in the minutes of the meeting it is recorded as decided that:

"To take part in the decisions of the church meetings the names of the parishioners must be entered in the parish book.   The names entered in the parish book should be those who have any need in the church."

The contentions between these factions for control of the church property reached a point of physical activity in which the police interfered for preservation of order, following which defendants remained in possession and those represented by plaintiff, claiming to compose the great majority of the original religious association which bought the church from which they had been excluded by force, thereafter held their meetings in the Russian National Home and assumed, so far as possible, continuation of the business management of the parish.   Skurko, who as secretary of the parish kept its records and had access to the archives of the church, went with the majority faction, taking along the church books and thereafter as secretary recorded in them the minutes of their proceedings as a continuation of the church records.   Other books

were procured by the faction in possession of the church in which its meetings were recorded by a chosen secretary.

Of the disturbances in and around the church which ended in the two organizations, it is claimed for plaintiff that the majority did no more than attempt to conduct or participate in the business meetings of the parish as customarily held according to their rights under the rules of procedure, which the minority forcibly prevented and expelled them from the church with police assistance; while it is claimed by defendants that none of the opposing faction who conducted himself in an orderly manner was ever excluded from the building or denied the privilege of worship and participation in the affairs of the church at proper times and in a proper way, all they did on those occasions being in suppression of boisterous conduct and contentions by certain leaders of the opposing faction which disturbed the religious services, and in resistance of a hostile attempt of the claimed majority with show of force to unlawfully take possession of the property and control the affairs of the church.

It is shown by the pleadings and testimony that this is the third suit commenced by or on behalf of plaintiff since these differences arose. No copy of any of the files or records of the two preceding cases appears in the printed record of this case. Of one it is conceded that the bill was dismissed on June 30, 1919. Defendants' counsel asserted it was between the same parties and involved the same matter, while plaintiff's counsel replied that it was the same parties but a different bill, and what the court did was to dismiss it in the absence of counsel for defendants. Of the other suit preceding this, it is alleged in plaintiff's bill that during its pendency the judge of the Wayne circuit court ordered an election to be held

by the parishioners of the church on May 25, 1919; that such election was held, participated in by both factions and conducted by an election committee, one member of which was appointed by the court and one by each of the parties to this suit, and that a report of such election committee was filed in the cause from which it appeared certain named parties were elected. In their answer defendants admit that such an election was ordered by the court but allege that—

"instead of being held in the church as ordered, was held instead in a Bolsheviki hall, which election was dominated by signers of said bill of complaint, and was a travesty on justice, and was just what could be expected from the signers of said bill of complaint and their associates."

The only testimony we discover in the record regarding this election is by Father Darin, who said there was an election committee of three appointed for that election, in which he represented the defense while an attorney by the name of Dorge represented the other side and he thought a report was sent in, but on its actual contents he throws little light. Who, if any one, represented the court is not disclosed. What the pleadings were in that case, why the rights of the parties were not adjudicated by it, or how it was disposed of, are left in this record to conjecture. It does appear, however, that before the instant suit was begun both the opposing factions incorporated under State laws as religious organizations. Those composing plaintiff moved first. On April 9, 1919, they filed their articles of association and incorporated as the "Russian Orthodox All Saints Church" of Detroit, being the name of the grantee in the deed to the church property given by the Asbury Methodist Episcopal church when the voluntary association composing this parish bought the property of it. Defendants' organization filed its articles of association

and incorporated on May 14, 1919, as the "All Saints Russian Orthodox Greek Catholic Church."

The trial court found that the various church books put in evidence by plaintiff contained the authentic records of the original voluntary association which organized for religious purposes and purchased this church property, and sustained as authentic the minutes of meetings recorded in them after the separation by Skurko, who had been unanimously elected as secretary for the year during which the factional division took definite form. Finding that the records showed plaintiff was first duly incorporated as successor and composed a majority of the voluntary association, the court held it to be the owner of the property in question, entitled to its possession and control for the use and benefit of the parish pursuant to the purpose of its organization and incorporation; an accounting as prayed for was granted, and a "meeting of the parishioners and congregation" was directed to be called, by specified notice, "for the purpose of selecting a treasurer and members of said church committee to serve until the next regular annual meeting of said parish and congregation."

Defendants ask reversal on numerous claimed errors both in findings of fact and conclusions of law. Broadly speaking, their claim appears to be that under the rules and regulations of the Russian church the majority of this voluntary association lost membership in the church as organized by refusing submission to its constituted government, declaring themselves an independent organization subject to no hierarchical jurisdiction, followed by their withdrawing from the church and leaving it in possession of that portion of the congregation yet faithful to its original purpose and doctrines.

This extreme view is not well sustained by convincing evidence. Plaintiff's members insist they

have remained loyal adherents to the tenets and confession of faith of the Russian Orthodox Greek Church in all matters of religious belief and discipline, and only the temporalities of the church are the subject of dispute by reason of the minority members excluding the majority and denying them the right to possession, use, and management of the church property in which, by the rules of the organization, they have a controlling beneficial interest.   There is little proof beyond assertion by defendants of any religious schism·or division by reason of diversity of· opinion on matters of faith and doctrine.   While abundance of ill-feeling and intolerance is manifested, both. parties strenuously claim adherence to the tenets and. doctrines of the church.    The situation seems to dis-- close a bitter factional fight in the church over its temporal affairs, rather than a secession of either party from it.

This voluntary association seems to have originally organized its temporal affairs as an independent parish or congregation, submitting thereafter in matters of faith or religious affiliation to the hierarchy of the United States diocese of the Russian Church of North America.

It is undisputed that the North American branch, or hierarchy, of the Russian church was divided into two dioceses, one including the United States and the other Canada, or the British provinces of North America, with an archbishop as the ecclesiastical head in authority over each.   In 1909 "The Normal Statutes of the North American Orthodox Diocese" of the Russian church were promulgated under the approval of Archbishop Platon, then archbishop of the United States diocese.    After this voluntary association was formed as a congregation and applied for a parish priest, it was furnished with a copy of these statutes, or by-laws of the diocese, which were accepted and

kept amongst its archives for guidance in religious organization and management of the parish by those in charge of its affairs. The association apparently conformed to its essential requirements, with some added provisions and by-laws not in conflict, to an extent then satisfactory to the church authorities. The provisions of these "normal statutes" relate largely to matters of ecclesiastical government, though running through them rules for guidance in temporal affairs are also provided. Independent parishes and congregational ownership of church property seem to be recognized. Some of its provisions run in part as follows: Of *"parishes"* it is said:

"Each parish has territorial limits, which are established and amended in conformity with and according to the demands of circumstances, on the conclusions of the District Ecclesiastical Superintendents' Council and upon the approval of the Supreme Diocesan Authority. * * *

"Newly established parishes may be of two kinds, independent and dependent. (*a*) If for some reason, for instance, for failure to comply with the obligations, mentioned in (4) the further existence of an independent parish is considered undesirable, the archbishop may inscribe the parish with its church as dependent on another parish."

Of the *"parishioners"* it is said:

"11. All persons of the Orthodox confession living within the boundaries of the parish shall be considered members."

Of *"church and parish property"* it provides in part:

"The church property is divided into two parts: (1) Property belonging to the church proper as such which is deeded to the Archbishop of the Diocese in trust for the congregation and the insurance policies are taken out in his name. (2) Property belonging to the parish. The right of ownership in the first in-

stance belongs to the church proper and in the second instance to the parish.   *   *   *

"The managing and disposition of church property of the first class belongs to the church officials with the participation of the parishioners, in the established order.   The managing and disposition of church property of the second class belongs to the parish.   *   *   *

"The church property may be disposed of as circumstances require in compliance with the resolutions of the parish meeting."

Paragraphs 27 to 39, inclusive, of the normal statutes relate to *"parish meetings."*   They are too lengthy to be quoted in full but among them appear the following excerpts:

"Parish meetings are ordinary, called by the Parish Council not less than once a year, and extraordinary, called in case of need on the initiative of the priest of the parish, the parishioners themselves, numbering at least twenty-five members, the parish council and the consistorial authorities.

"All full members of the parish may take part in the parish meetings, that is to say, adult members who pay on their own account all the fees the parish statute prescribes not less than six months and who have fulfilled at certain periods the duties of penance and communion.   *   *   *

"If balloting is necessary, it is done either openly or by secret voting, if but a single member requires it.   The resolution is established by the simple majority of the votes.   *   *   *

"The resolutions of the parish meetings are recorded by the parish secretary in a special book of protocols kept in the church archives without any delays and are signed by the chairman and all present either personally or through a representative.   *   *   *

"The parish members dissatisfied with the resolutions approved by the parish meeting, may within 30 days protest to the Rural Dean (blagochinni), who in turn will consider the protest and make his report within thirty days."

Not only do ownership and control of church property by a majority of the members of the parish organization which furnished it appear to be recognized by these normal statutes, but it is conceded that the acceptance or rejection of a priest for the parish rests with the majority of its members. Rules were adopted by the organization as to residence, assistants, compensation, etc., of the various priests it had and agreed upon before they were accepted and entered upon their pastorates. When Father Darin became pastor of the church it was a fully organized society owning a church building, parish house with the usual furnishings and equipment. It was managing its business and temporal affairs through elected officers under by-laws or rules duly adopted by a majority of members of the organization. On August 1, 1918, shortly before Father Darin was accepted as pastor and at a time when no dissensions over church matters are shown, by-laws of the church were adopted at a meeting of the parishioners providing that the church committee should advise the new priest and assistant of their salaries and other conditions which the meeting determined. Salaries were specified, provision made for residence, heat, light, telephone and other household necessities, and it was specified they should "perform sermons and all church duties promptly on time," with various other somewhat singular details, it being also stated in the by-law that "They may be removed from office by the parishioners at any time if they fail to live up to the rules." Of this right of the congregation Father Darin replied on cross-examination:

"If they were members in good standing of the church, and law abiding members of the church and held meetings decently, after announcement in the church, and in the church property, they would have a right to tell me to go, and I would go."

We think it clearly shown that the parish was organized by this voluntary association under a congregational form of government for its temporal affairs and so recognized by the ecclesiastical authorities with which it affiliated and to which it submitted in matters of faith and form of worship. The record discloses no attempt by plaintiff, constituting the majority members of the organization, to at any time change the ritual, discipline, or confession of faith or deny in spiritual matters the jurisdiction of the Russian Orthodox Greek Church of North America, as promulgated in the protocol or "normal statutes" recognized in the organization of this congregation.

A civil court cannot undertake to determine the sincerity with which a religious creed is professed. So long as the property purchased and owned by this society is not diverted from the religious and moral purpose for which it was procured, we find nothing in the rules or by-laws of the ecclesiastical jurisdiction to which it submitted precluding the society in its civil capacity from managing its temporal affairs according to the will of the majority. The records make clear that congregational government in temporal affairs was not vested in either its pastor or in the minority, who seem to have assumed it.

The indicated position of defendants is that those of plaintiff's organization, even though constituting a majority of members up to the time of the division, had seceded and become "anti-church men, applying all efforts to destroy the same," and therefore, as minuted in the minority records,—

"in order to enforce order in church affairs and to gather on the meeting only true church members it was necessary to organize a church protecting society for the remaining true members. Because the usual announcement of the meeting as it was practiced till this time did not lead to good results but to the

worst. It was noticed lately that church meetings were attended not only by anti-church members and bolshevists but also by outsiders, such as Polish and Jews."

This "church protecting society" was organized under leadership of Father Darin about the time differences between the factions became most aggressive and it thereafter, without notice or trial so far as shown, excommunicated, or expelled from membership, the so-called "anti-church members," held possession of the church building and assumed exclusive management of temporal affairs, with Father Darin in charge as pastor. As a church militant it appears to have furnished the protection its name implies, for in the record of one meeting which "ended with singing and prayer" it is recorded, "The meeting did not pass without any incidents, some of the anti-church men managed to get in and tried to break it up, but did not succeed, police were on hand who put them out." Of its attitude towards the erring brothers, most of whom were conceded to have been acceptable members of the church before the overthrow of the Russian empire, it was recorded:

"The church protecting society does not close the church doors to anybody, even not to anti-church men, but all those that are known to be agitating against the church will not be permitted to participate in settling of the affairs of the church."

An apparent list of members of the church protecting society in the record shows the names of 50 members, though it is stated more were present at the meeting "but not all signed their name on account of the late hour and some were illiterate." That they composed but a small minority of the membership before the enforced hegira is conclusively shown.

However belligerent the so-called anti-church members might have been at the start, they abandoned the

struggle when confronted with the church protecting society backed by the police, and no longer tried to participate in or conduct business meetings at the church, but still claiming loyalty to the tenets of the church and as majority members of the congregation entitled to control its temporal affairs, they thereafter held meetings in the Russian home and assumed to continue the organization as before related.

Their first formal congregational meeting was held on March 23, 1919, and is stated in the record of it entered by Secretary Skurko, which the trial court found authentic, to have been conducted "according to the announcement of the priest of the church for the parishioners to assemble at this meeting on the 23d day of March." Defendants deny any such notice was given. Plaintiff's testimony is that a written notice was handed Darin at a previous meeting in the church with request to announce it. He denied making the announcement. A witness of plaintiff named Ribko testified he passed up the notice and requested him to make the announcement; that:

"He turned around and said: 'Well, I was just given a notice to announce the meeting. I will not be present there.' * * * He took it out from his sleeve pocket, read notice, and he added he would not be present there."

In any event a general notice of the meeting is indicated by the record which shows 400 members attending and voting. Plaintiff's counsel states that a list of members of the society shows 513 names, and the then congregational strength of the parish is given as about 450.

Defendants contend plaintiff's meeting of March 23d and others which followed were void because held elsewhere than in the church. It is shown that prior to the dissensions congregational meetings for business were held at times in the Russian National

Home.    Even if the rules of the association required such meetings to be held in the church, which is not clearly shown, the majority could not be deprived of their civil rights in the business affairs of the congregation through their forcible exclusion from the church by the minority with police assistance.    So far as the temporal affairs of this congregation are concerned they are subject to that sound principle which underlies all our civic institutions, that in every organized society the controlling power rests with the majority.

Neither can the wholesale expulsion, or excommunication, by the minority constituting the opposing faction, without notice or hearing, be sustained.

"While the civil courts will studiously give full effect to the judgment of an ecclesiastical court when matters ecclesiastical only are involved, when civil rights as to property are involved the civil courts will insist that an accusation be made, that notice be given, and an opportunity to produce witnesses and defend be afforded, before they will give effect to an expulsion or suspension of the kind here attempted.    Hoffman Ecclesiastical Law, 276, 277."    *West Koshkonong Congregation* v. *Ottesen,* 80 Wis. 62 (49 N. W. 24).

Not only did the division result in both factions being short of officials as elected at the meeting of January 5, 1919, but vacancies were often occurring during those turbulent times owing to members leaving for Russia or elsewhere, a frequent answer to inquiry as to the whereabouts of an officer or member being: "In the old country."

Plaintiff's counsel do not deny the validity of the annual meeting of January 5, 1919, but state certain mistakes were made there in electing disqualified persons to the church soviet or committee which constituted its advising or managing body, apparently analogous to the customary board of church trustees,

and claim that at the congregational meeting of March 23d held in the Russian people's home "the congregation, with more than two-thirds present, added to and confirmed the election of January 5th, and corrected certain errors on that election, as it had the power to do according to its laws." For this authority the following relative to members of the committee is quoted:

"1.   *   *   *   (If the above should not be qualified they may be subject to change or dismissal on every meeting.)   *   *   *

"It was decided that the members of the committee should immediately be present on the meetings of the committee.   Those that will not be present will be dropped as members of the committee.   The members agreed to it."

At the March 23d meeting, after a report by a member of the church committee, and a member of the auditing committee, Secretary Skurko as a member of said committee reported that the title to the church property was recorded as that of a corporation, and the present committee having "violated the decision of the meeting assembled January 5, 1919, it could not file articles of association." This hazy elucidation was followed by "many debates," after which it was unanimously decided to add some more members to the existing church committee, and also, like the opposition, to expel some former members, or remove them "from all church affairs." Having filled up and readjusted its complement of officers, action was taken at subsequent meetings for incorporating the association, and favorable action to that end was unanimously taken at a meeting held April 13, 1919, attended by "over four hundred good standing members of the above church."

The church protecting society in possession of the property followed along lines less indicative of contin-

uation of the original voluntary association. They
met on March 8th with Father Darin in preliminary
organization and again on March 22d "to prepare for
a congregational meeting of the members of the
newly organized organization for the protection of
our church." Postal card notices were afterwards
sent to 76 selected persons, 70 of whom are said to
have attended. It is contended by plaintiff that most
of these were not former members of the parish. If
they all were members they composed a comparatively
small minority of the members according to the
records at the time of the division. So starting they
took and later incorporated under the name "All
Saints Russian Orthodox Greek Catholic Church."
The majority had then incorporated as the "Russian
Orthodox All Saints Church," being the name under
which the property was deeded to the original vol-
untary association.

As an unincorporated voluntary society could not
hold title to real estate in its own name without com-
plying with enabling legislation, the society which
each claims to represent could hold no legal title to
its church realty while it remained unincorporated,
whatever its equitable interest might have been. But
by our enabling act confirming defective conveyances
it is provided:

"No conveyance of land or instrument intended to
operate as such conveyance, made in good faith and
upon a valuable consideration, whether heretofore
made or hereafter to be made, shall be wholly void
by reason of any defect in any statutory requisite in
the sealing, signing, * * *; nor shall any deed
or conveyance, heretofore or hereafter to be made,
designed and intended to operate as a conveyance to
any religious or benevolent society or corporation, be
wholly void by reason of any mistake in the name or
description of the grantee, nor because of any failure
of such society or corporation to comply with any
statutory provisions concerning the organization of

such society or corporation: *Provided, Such society or corporation shall hereafter comply with the provisions of the statute touching the organization or incorporation of such societies.*"  *  *  *  3 Comp. Laws 1915, § 11784.

Measuring the legal rights and obligations of members belonging to this voluntary association by civil laws, or even its own by-laws and rules, the proceedings under which the minority members assumed to transfer themselves into a majority in order to control its temporal affairs cannot be recognized as of any legal validity.  The majority members first took legal steps in the society's name and as its successor to, and did, comply with the provisions of the statute authorizing incorporation of unincorporated voluntary religious societies.  There could be but one valid incorporation of the society.  As we view the rift between the two factions there was no actual secession on doctrinal or other grounds by either faction from the church, or society, but a contest for supremacy within it amongst its members for control of its temporalities.  The incorporation by plaintiff was a valid incorporation by the majority of and for the entire voluntary association, including both factions. It thereby succeeded to the temporalities of the society, but in trust for the religious purposes and uses for which they had been procured and dedicated by that society, and in which each member has a beneficial interest.  The majority have not, and could not because of this factional dispute for control, read out of the association those belonging to the opposing faction, if valid members at the time of the division, any more than could the minority.  The faithful exercise by plaintiff of this trust, by whomsoever controlled, remains a subject of equity cognizance.  So long as that trust is not violated the unquestioned right of control is with the majority.

While equity control over corporate elections is most commonly exercised by injunctive process, the trial court's order directing an election to be held by plaintiff finds a measure of support in 14A C. J. p. 54, § 1805, and certain of the cases there cited. Owing to the factional contentions and disturbed conditions in this association, with shifting members and change of officers, the reasons for requiring an honest election open for and confined to all actual members of this association when the division arose are persuasive. Amongst other things it appeared as the court found, "that the former treasurer, Grigori (Harry) Trusko, and certain members of the church committee, have left this country and are no longer in the United States." Interrogated relative to such changes, secretary Gurko testified: "We were filling out, as members were dropped out, leaving for the old country, or leaving the city, filling in when they went."

It was said in the opinion of the trial court that at the election to be held "only members whose names are on the book of membership will be allowed to vote."

Not only the fact that their names are on the book of membership but *when* they were put there should be taken into consideration. The book containing a list of the members of the parish kept in the archives of the church was emphasized by this association as a test of right to participate in its affairs at various times before these dissensions arose. On March 5, 1916, it was decided at a parishioners' meeting that every orthodox person desiring to become an actual member should enter in the membership book, "his name and address, and only then shall he have a right to vote at the election of members of the board or while deciding important questions at the parishioners' meetings." On March 4, 1917, it was decided at a

parishioners' meeting that only after a person wishing to become an actual member had entered his name on the parish book "shall he have acquired the right to vote on the elections of the board, or have the right to vote on decisions of church affairs at the parishioners' meetings, or to possess any of the property of the Russian people's home." Which also suggests a somewhat close relation between the church and the Russian people's home at that time. And, again, at the parishioners' meeting of January 5, 1919, shortly before the factional division took distinct form, it was decided as before quoted that entry of a member's name in the parish book should be a prerequisite to taking part "in the decisions of the church meetings." It may fairly be assumed that the members whose names were so entered in the parish book up to that time had been accepted by the undivided association as members of the parish and church agreeable to its doctrinal and other requirements, and had participated to some degree while harmony prevailed in maintenance of the church and procuring the temporalities which are the subject of this litigation. Not alone, as the trial court determined, should "only members whose names are on the book of membership" be allowed to vote at the election to be held, but the test should be only those members whose names were on the book of membership at the time of the last undivided meeting of January 5, 1919, and who at the time of the election are "living within the boundaries of the parish." So far as these temporalities are concerned, which is all the court can consider, factional attempts to expel old members or add new ones thereafter cannot be recognized.

While the extent to which a court of equity may direct or supervise such corporate election might in certain respects be questioned, it is clearly within the

power of the court to withhold the relief asked, under the conditions shown here, until an honest election has been held on that basis. Delivery of possession and accounting ordered by the trial court should be deferred until after such election is held and a new church committee, or board of directors, duly chosen to transact the business of the corporation.

Modified as herein indicated, the decree will stand affirmed, and the case remanded to the Wayne county circuit court, in chancery, for such further proceedings in harmony with this opinion as that court may determine, without costs of this court to either party.

WIEST, C. J., and FELLOWS, McDONALD, BIRD, and SHARPE, JJ., concurred. CLARK and MOORE, JJ., did not sit.