COLIN v IANCU

Docket No. 28430. Submitted December 13, 1977, at Detroit.—Decided
April 17, 1978. Leave to appeal applied for.

A majority of the members of St. Simon Romanian Orthodox
Church voted to become independent from the Romanian Or-
thodox Episcopate of America. The vote split the parish mem-
bership into two groups and presented the issue as to which
group was entitled to the use and control of the church build-
ings and assets. The plaintiffs, Laura Colin, Pavel Lupsa, and
Harold Zorlen, representing the minority who remained faith-
ful to the Episcopate, and the Episcopate filed suit seeking to
recover the church property and assets held by the majority
and to enjoin Father Mihai Iancu, leader of the majority group,
from functioning as a priest. The St. Simon Independent Roma-
nian Orthodox Church was allowed to intervene as a party
defendant. The Wayne County Circuit Court, Irwin H. Burdick,
J., held for the plaintiffs. Defendants appeal. *Held:*

Father Iancu and his followers could leave the Episcopate
and establish an independent church, however, since they have
established an independent church under the jurisdiction of
another authority they have no right to keep the property and
it should go to the minority faithful to the Episcopate in
accordance with the constitution and by-laws of the Romanian
Orthodox Episcopate of America as provided in the articles of
incorporation of the St. Simon Romanian Orthodox Church.

Affirmed.

1. APPEAL AND ERROR—RELIGIOUS SOCIETIES—SCHISMS—FAITHFUL MI-
NORITY—DIVERSION OF PROPERTY BY MAJORITY.

A trial court did not err in granting the property of a church to
the minority of the parishioners who had remained faithful to
the church when a schism arose and a majority of the parish-
ioners voted to establish an independent church where the

REFERENCES FOR POINTS IN HEADNOTES

[1–3] 66 Am Jur 2d, Religious Societies §§ 41, 42, 47, 51–56.

Change of denominational relations or fundamental doctrines by
majority faction of independent or congregational church as
ground for award of property to minority. 15 ALR3d 297.

articles of incorporation of the church provided that the church was bound by by-laws and a constitution providing that in the event of a schism the church property should go to those parishioners who remained faithful to the church.

2. RELIGIOUS SOCIETIES—SCHISMS—PROPERTY—FAITHFUL MEMBERS.

While members of a church possess the right to withdraw from it, with or without reason, they cannot take with them, for their own purposes, or transfer to any other religious body, the property dedicated to and conveyed for the worship of God under the discipline of the religious association to which said church belongs; nor can they prevent its use by those who choose to remain in the church, and who represent the regular church organization.

3. RELIGIOUS SOCIETIES—DIVERSION OF PROPERTY OF MAJORITY.

A majority faction of a local congregation or religious society, being one part of a large church unit, however regular its action or procedure in other respects, may not, as against a faithful minority, divert the property of the society to another denomination or to the support of doctrines fundamentally opposed to the characteristic doctrines of the society, although the property is subject to no expressed trust.

*Richard C. Tripp,* for plaintiffs.

*Frank A. Clancy,* for defendants.

Before: N. J. KAUFMAN, P. J., and BRONSON and D. E. HOLBROOK, JJ.

D. E. HOLBROOK, J. This case involves a dispute between two factions of the St. Simon Romanian Orthodox Church. The plaintiffs represent the Romanian Orthodox Episcopate of America (hereafter called Episcopate) headed by Bishop Valerian Trifa. The defendants are represented by Father Mihai Iancu who is the leader of the St. Simon Independent Romanian Orthodox Church which separated from the Episcopate. Originally, the Articles of Association of St. Simon Romanian Orthodox Church provided that the church membership would worship and labor together accord-

ing to the discipline, rules and usage of the Romanian Orthodox Church in the United States of America as from time to time authorized and declared by the Romanian Orthodox Episcopate. On March 25, 1973, the majority of the parish voted to become independent from the Episcopate due to their discontent with Bishop Trifa and this resulted in a splitting of the parish membership into two groups.

As a result of this division, the issue arose as to which group was entitled to the use and control of the church buildings and assets. On January 17, 1974, plaintiffs filed a suit in Wayne County Circuit Court to recover the church property and restrain Father Iancu, who had been defrocked by Bishop Trifa, from functioning as a priest or using the church assets. After a bench trial, the trial judge held that the church was hierarchal and not congregational in nature and that a schism had developed within the church. As the constitution and by-laws of the Episcopate provided that the group which recognized the jurisdiction of the Episcopate was entitled to the church property, the trial judge held that plaintiffs were entitled to the property as it existed on March 25, 1973.

A better understanding of this case is possible by reviewing the historical background of the church.

In 1941, when the parish was incorporated as an ecclesiastical corporation, the Mother Church in Romania did not have a bishop in America and formal recognition was not granted for that reason.

The Romanian Orthodox Missionary Episcopate of America came into existence in 1929. The Bishop of the Episcopate was Bishop Morusco who was kept in forced domicile in Romania and was

not allowed to return to the United States to join his diocese. The Romanian Patriarch appointed one Nica to replace Bishop Morusco in 1948, however, he remained in Paris, when he did not get the authorization to come to the United States.

In 1950, an American citizen named Moldovan was called to Romania and ordained as a bishop by the Romanian Patriarch and the Synod of Bishops. He was sent back to the United States to head the Romanian Orthodox Missionary Episcopate of America. When he attempted to take charge of the Episcopate, its members contested the authority of the Holy Synod. They believed that they were autonomous and could elect their own bishop. In *Romanian Orthodox Missionary Episcopate of America v Trutza,* 205 F2d 107 (CA 6, 1953), *cert den,* 346 US 915; 74 S Ct 274; 98 L Ed 410 (1953), the Court determined that the Episcopate, in fact, was autonomous and the Episcopate changed its name to the Romanian Orthodox Episcopate of America. All the parishes, including St. Simon, voluntarily submitted themselves to this autonomy. By submitting to this autonomy, to its constitution and by-laws, they established a hierarchal church with canonical and administrative jurisdiction. The Court also determined that the existing Episcopate had full authority to control its property without interference from the Romanian Patriarch.

Valerian Trifa was born in Romania where he studied theology. He was a lay missionary for many years in his native country and left Romania in 1941. In 1952, he went through the steps necessary for becoming a bishop. He was ordained a deacon, a priest and then a bishop during a three-week period. This rapid rise is very rare and Bishop Trifa stated that he only remembers it

happening once before. This was in Romania during the 1930's.

Father Iancu also studied in Romania and was ordained a priest there in 1958. He came to America in 1970 as a political refugee and went to the St. Simon Church to fill a vacancy after meeting with Bishop Trifa. He was appointed the administrator of the church and was under the supervision of Bishop Trifa. He was subject to the constitution and by-laws of the Episcopate. Father Iancu was very popular with the parish and the church's membership grew considerably. Also, substantial improvements were made to the church building which had been in need of repair.

A dispute arose between Bishop Trifa and Father Iancu. It appeared that Father Iancu might be relieved of his position by Bishop Trifa. At the annual membership meeting of St. Simon Church held on January 28, 1973, Father Iancu was appointed permanent priest for the parish. This apparently was an effort to prevent Bishop Trifa from removing him. The membership also approved a resolution that in the event the Episcopate should replace Father Iancu, the parish would withdraw from the Episcopate and become independent. When Bishop Trifa was notified of these proceedings, he relieved Father Iancu as administrator of St. Simon Church. A general meeting of the membership of St. Simon was called for March 25, 1973, and they voted to leave the jurisdiction of Bishop Trifa and establish an independent church.

Subsequently, Bishop Trifa had Father Iancu defrocked. However, Father Iancu and his followers remained in control of the church properties and assets.

The defendant raises two issues on appeal. How-

ever, there is only one issue to be decided by this Court—did the trial court err in granting the property of St. Simon parish to those parishioners who remained faithful to the Romanian Orthodox Episcopate of America? The defendant asserts that this Court cannot determine whether or not there was a schism in the St. Simon Church and cannot award the property based upon the by-laws of the Episcopate since to do this involves this Court in ecclesiastical matters. The plaintiffs maintain that since a schism has arisen in the parish, under the by-laws of the Episcopate, those members who are faithful to the Episcopate are entitled to the church's property.

On February 21, 1971, when Father Iancu was appointed parish administrator by Bishop Trifa, he took the following oath:

"Upon being entrusted with the administration of the parish, I voluntarily declare *to recognize and submit to the canonical and administrative jurisdiction of the Romanian Orthodox Episcopate of America and to its Bishop Valerian D. Trifa and to his legal and canonic successor,* and that *I will not recognize the authority of any other church organization or person and I will not permit the parish to which I am entrusted to submit itself under any other jurisdiction.* In fulfilling my mission, *I will work in accordance with the Constitution and By-laws of the Romanian Orthodox Episcopate of America and will abide totally to the decision of the Episcopate Congress and to the Episcopal Council, so help me God."* (Emphasis supplied.)

Father Iancu clearly violated this oath. He declared that he would submit to the jurisdiction of the Episcopate and Bishop Trifa and would not recognize any other church organization. In addition, he declared that he would not permit the parish to submit itself under any other jurisdic-

tion. However, Father Iancu participated with members of the parish in getting the parish of St. Simon to split with the Episcopate and had himself elected priest for life. This group called itself the St. Simon Independent Romanian Orthodox Church and claims to be no longer under the jurisdiction of the Episcopate but under the jurisdiction of the Romanian Orthodox Church of Western Europe. Thus, the group of parishioners led by Father Iancu have established a new church under a different jurisdiction. The defendants assert that because the Romanian Orthodox Church of Western Europe is under the jurisdiction of the Romanian Holy Synod, they have not split from the Mother Church and have a right of control over St. Simon's property. Defendants claim that this is not a case where the majority members of a church change orthodoxy and try to take the church property from the minority. We do not agree. The United States Court of Appeals held that the Romanian Orthodox Episcopate of America was autonomous from the Romanian Orthodox Church. When the St. Simon Church adopted the constitution and by-laws of the Romanian Orthodox Episcopate of America, St. Simon and the Romanian Orthodox Episcopate of America were autonomous of the Romanian Orthodox Church and, therefore, this is a case where the rule of the faithful minority is applicable. The Articles of Incorporation of the St. Simon Church state as follows:

" 'St. Simon' Romanian Orthodox Church.

"We, the undersigned, desiring to become incorporated under the provisions of Art No. 327 P.A. 1931, do hereby make, execute and adopt the following articles of association, to-wit:

"First, The name assumed by this corporation and by

which is *[sic]* shall be known in law, is 'St. Simon' Romanian Orthodox Church.

"Second, The location of said church shall be in the City of Highland Park, county of Wayne and state of Michigan; Post office address _____ John R, ____.

"Third, The time for which said corporation shall be created shall be perpetual.

"Fourth, The members of said church or society shall *worship and labor together according to the discipline, rules and usage of the Romanian Orthodox Church in the United States of America as from time to time authorized and declared by the Romanian Orthodox Episcopate."* (Emphasis supplied.)

Thus, the St. Simon parish was incorporated and entered into an association with the Episcopate with full knowledge of its discipline, rules and usage and agreed to be bound thereby.

Although Father Iancu declared in his oath that he would work in accordance with the constitution and by-laws of the Romanian Orthodox Episcopate of America, his refusal to give up the St. Simon Church property indicates that he did not follow his oath. A review of the constitution and by-laws of the Romanian Orthodox Episcopate of America clearly states what is to be done with church property in the case of a schism. Article IX of the by-laws provide in part as follows:

"Section 1.

"The parish is the community of the faithful in a specified geographical area under the jurisdiction of the Romanian Orthodox Episcopate, having a priest as spiritual leader, and being administered by a parish council duly elected by its general assembly.

\* \* \*

"Section 6.

"The assets of the parish shall be administered by the parish council in accordance with the Episcopate By-

Laws and the laws of the state in which the parish is located.

*   *   *

"Section 10.

"In the event of the dissolution of a parish, title to all of its properties, real and personal, including documents, religious objects, vestments, works of art, and any other articles used in conjunction with and for the purposes of the parish shall pass to the patrimony of the Episcopate.

"Section 11.

*"In case of a schism within the parish, or departure from the Orthodox faith, the party or group recognizing the jurisdiction of the Episcopate shall be entitled to complete control of all parish property of every kind, nature and description."* (Emphasis supplied.)

No one disputes the fact that Father Iancu and his followers could leave the Episcopate and establish an independent church. However, where they have created an independent church under the jurisdiction of another authority, then they have no right to keep the property and it should go to the "faithful minority".

The right of the "faithful minority" has been recognized in Michigan. In *Fuchs v Meisel,* 102 Mich 357, 373–374; 60 NW 773 (1894), the Michigan Supreme Court stated:

"In the freedom of conscience and the right to worship allowed in this country, the defendants and the members of this church undoubtedly possessed the right to withdraw from it, with or without reason. *But they could not take with them, for their own purposes, or transfer to any other religious body, the property dedicated to and conveyed for the worship of God under the discipline of this religious association; nor could they prevent its use by those who chose to remain in the church, and who represent the regular church organization."* (Emphasis supplied.)

See also, *Immanuel Evangelical Lutheran Church v Fromm*, 367 Mich 575, 588; 116 NW2d 766 (1962), *Macedono-Bulgarian Orthodox Church St. Clement Ohridski v Macedonian Patriotic Organization Fatherland*, 27 Mich App 713, 725; 184 NW2d 233 (1970), *Holwerda v Hoeksema*, 232 Mich 648, 655; 206 NW 564 (1925), *Davis v Scher*, 356 Mich 291; 97 NW2d 137 (1959).

In *Davis, supra,* at 298, the Court said:

"The weight of authority in Michigan is to the effect that the majority faction of a local congregation or society, being one part of a large church unit, however regular its action or procedure in other respects, may not, as against a faithful minority, divert the property of the society to another denomination or to the support of doctrines fundamentally opposed to the characteristic doctrines of the society, although the property is subject to no expressed trust."

Affirmed, costs to plaintiffs.