BENNISON v SHARP

Docket No. 58097. Submitted May 5, 1982, at Grand Rapids.—Decided
    December 6, 1982. Leave to appeal applied for.

St. Paul's Episcopal Church is an ecclesiastical corporation orga-
    nized in 1871 and incorporated in 1901 under a Michigan
    statute providing for the incorporation of Protestant Episcopal
    Churches. The legal title of the property in dispute, which
    includes a church, parish house and rectory, acquired in 1959,
    is in the name of St. Paul's Episcopal Church. The Protestant
    Episcopal Church in the United States of America (PECUSA),
    organized in 1789, was the product of secession of the Anglican
    church in the colonies from the Church of England. PECUSA,
    an unincorporated association, is governed by a general conven-
    tion and a bishop. Affiliated with it are numerous dioceses,
    each of which is governed by a diocesan convention and a
    bishop. A diocese operates missions and admits parish churches
    to membership in the diocese and PECUSA. Parishes are
    represented by their clergy and elected lay representatives in
    the conventions of the diocese in which they are located.
    Dioceses are represented in the general convention by their
    bishops and by elected clergy and lay representatives. PECUSA
    and the Diocese of Western Michigan, with which St. Paul's
    Episcopal Church is affiliated, have each promulgated canons
    and a constitution governing church polity and church financial
    and spiritual matters. In 1976, the General Convention of
    PECUSA amended its canons to institute various doctrinal
    changes within the church. Defendant James R. Sharp, Rector
    of St. Paul's Episcopal Church, and a majority of the members
    of St. Paul's were opposed to the changes. At a meeting of the
    membership of St. Paul's, a majority present voted to delete

REFERENCES FOR POINTS IN HEADNOTES

[1, 3] 66 Am Jur 2d, Religious Societies § 45.

[2] 66 Am Jur 2d, Religious Societies §§ 37, 41, 42, 51.

Determination of property rights between local church and parent
    church body: modern view. 52 ALR3d 324.

[4] 73 Am Jur 2d, Summary Judgment § 26.

[5] 73 Am Jur 2d, Summary Judgment § 23.

[6, 7] 66 Am Jur 2d, Religious Societies § 50.

from the parish bylaws all reference to the Protestant Episcopal Church and to the diocese constitution and canons, with the intent of seceding from the Episcopal Church and the Diocese of Western Michigan. The bishop of the diocese inhibited Sharp on December 10, 1979, thereby suspending him from performing as an Episcopal priest for six months. A substitute priest sent by the bishop to conduct services at St. Paul's was denied admission by defendants. The minority members of the church began meeting for worship at a temporary location. The minority members held an annual parish meeting and elected plaintiffs Curtis L. Jones and Roger R. Henry vestrymen and wardens of St. Paul's Episcopal Church. Then, at a special parish meeting held by defendants and the seceding majority, a resolution was adopted to disaffiliate with the Episcopal Diocese of Western Michigan and to affiliate with the Anglican Catholic Church. A new ecclesiastical corporation was formed by the majority in affiliation with the Anglican Catholic Church, under the name of St. Paul's Anglican Catholic Church of Grand Rapids. Defendants Russell V. Brown, Jr., Earle A. Slenker, and William D. Miller, who had been acting as Senior and Junior Wardens and Secretary, respectively, of St. Paul's Episcopal Church, thereafter acted for St. Paul's Anglican Catholic Church. At the same time, new deeds were executed conveying the subject property to the new corporation. Charles E. Bennison, Bishop of the Diocese of Western Michigan of PECUSA, and Jones and Henry, wardens of St. Paul's Episcopal Church, commenced an action in the Kent Circuit Court to enjoin defendants, James R. Sharp and others, from transferring church properties belonging to St. Paul's Episcopal Church to St. Paul's Anglican Catholic Church. Recordation was enjoined by the trial court pending final disposition of the case. St. Paul's Episcopal Church continues to exist as an ecclesiastical corporation. Later, the status of plaintiffs Jones and Henry as vestrymen and wardens was considered by the Bishop and the Executive Counsel of the Diocese of Western Michigan. Jones and Henry were determined to be the lawful representatives of St. Paul's Episcopal Church. By resolution the individual defendants and seceding vestrymen were declared not to be the valid and lawful officers and vestrymen of St. Paul's Episcopal Church. At the annual convention of the diocese held in October, 1980, St. Paul's Episcopal Church was represented by delegates chosen by the vestry and were officially seated after approval of their credentials. The trial court, Woodrow A. Yared, J., granted summary judgment enjoining defendants from conveying the real and personal property and declaring

plaintiffs to be entitled to possession and control of the property. Defendants appealed. *Held:*

1. Civil courts have general authority to resolve disputes over the ownership of church property.

2. In the absence of an express trust provision by which the property is held for the teaching, support or spread of some specific form of religious doctrine or belief where property is purchased for the use of a religious congregation, so long as any existing religious congregation can be ascertained to be that congregation, or its regular and legitimate successor, it is entitled to the use of the property.

3. States may adopt either of two methods in deciding the ownership of church property: 1) the polity or hierarchical method; or 2) the neutral principals of law method. The conclusion that the Episcopal Church is a hierarchy requires no searching inquiry into church polity.

4. Where the determination has been made that the church is one of a representative form of government the Court will not interfere in any manner with the decision of the governing body except to determine whether the governing body had jurisdiction to do what it did.

5. A majority faction of a local congregation or religious society, being one part of a large church unit, however regular its action or procedure in other respects, may not, as against a faithful minority, divert the property of the society to another denomination or to the support of doctrines fundamentally opposed to the characteristic doctrines of the society although the property is subject to no express trust.

Affirmed.

1. RELIGIOUS CORPORATIONS AND ASSOCIATIONS — CHURCH PROPERTY — COURTS — CONSTITUTIONAL LAW.

Civil courts have general authority to resolve disputes over the ownership of church property; the First Amendment, however, severely circumscribes the role that civil courts may play in resolving church property disputes by prohibiting civil courts from resolving church property disputes on the basis of religious doctrine and practice and requiring that courts defer to the resolution of issues of religious doctrine or polity by the highest court of a hierarchical church organization.

2. RELIGIOUS CORPORATIONS AND ASSOCIATIONS — CHURCH PROPERTY.

In the absence of an express trust provision by which the property is held for the teaching, support or spread of some specific form of religious doctrine or belief, where property is purchased

for the use of a religious congregation, so long as any existing religious congregation can be ascertained to be that congregation or its regular and legitimate successor, it is entitled to the use of the property.

3. RELIGIOUS CORPORATIONS AND ASSOCIATIONS — CHURCH PROPERTY
   — CONSTITUTIONAL LAW.

   States may adopt either of two methods in deciding the ownership of church property: 1) the polity or hierarchical method; or 2) the neutral principals of law method.

4. JUDGMENTS — SUMMARY JUDGMENT — GENUINE ISSUES OF FACT.

   Affidavits, pleadings, depositions, admissions and other documentary evidence must be considered by a court when considering a motion for summary judgment for failure to state a genuine issue of material fact, and the benefit of every reasonable doubt must be given to the party opposing the motion; the motion tests whether factual support exists for the claim made (GCR 1963, 117.2[3]).

5. JUDGMENTS — SUMMARY JUDGMENT — GENUINE ISSUES OF FACT —
   BURDEN OF PROOF.

   A party opposing a motion for summary judgment for failure to establish the existence of a genuine issue of material fact bears the burden of coming forward with some proof to establish the existence of a genuine issue of material fact (GCR 1963, 117.2[3]).

6. RELIGIOUS CORPORATIONS AND ASSOCIATIONS — CHURCH PROPERTY.

   While members of a church possess the right to withdraw from it, with or without reason, they cannot take with them, for their own purposes, or transfer to any other religious body, the property dedicated to and conveyed for the worship of God under the discipline of the religious association to which the church belongs; nor can they prevent its use by those who choose to remain in the church and who represent the regular church organization.

7. RELIGIOUS CORPORATIONS AND ASSOCIATIONS — CHURCH PROPERTY.

   A majority faction of a local congregation or religious society, being one part of a large church unit, however regular its action or procedure in other respects, may not, as against a faithful minority, divert the property of the society to another denomination or to the support of doctrines fundamentally opposed to the characteristic doctrines of the society, although the property is subject to no express trust.

*Law, Weathers & Richardson* (by *Niel A. Weathers* and *Kevin B. Krauss),* for plaintiffs.

*Hess & Loeks, P.C.* (by *Daniel B. Hess* and *Susan A. Andrews),* for defendant.

Before: D. F. WALSH, P.J., and WAHLS and J. R. McDONALD,* JJ.

WAHLS, J. This is a church property dispute which arose when a majority of the members of St. Paul's Episcopal Church of Grand Rapids seceded from the general church with which St. Paul's is affiliated, the Protestant Episcopal Church in the United States of America (PECUSA), formed St. Paul's Anglican Catholic Church and affiliated with the Anglican Catholic Church.

Plaintiff Bennison, Bishop of the Diocese of Western Michigan of PECUSA, and plaintiffs Jones and Henry, wardens of St. Paul's Episcopal Church, commenced this action on May 13, 1980, seeking to enjoin defendants from transferring church properties belonging to St. Paul's Episcopal Church to St. Paul's Anglican Catholic Church. Defendants, members of the seceding majority, appeal as of right from the trial court's order of summary judgment under GCR 1963, 117.2(3), enjoining defendants from conveying the real and personal property in question and declaring plaintiffs to be entitled to possession and control of such property.

The following facts are not in dispute. St. Paul's Episcopal Church is an ecclesiastical corporation organized in 1871 and incorporated in 1901 under 1899 PA 40, MCL 458.251 *et seq.;* MSA 21.1851 *et seq.,* an act providing for the incorporation of Protestant Episcopal Churches. The legal title of

---

* Circuit judge, sitting on the Court of Appeals by assignment.

the property in dispute, which includes a church, parish house and rectory, acquired in 1959, is in the name of St. Paul's Episcopal Church.

PECUSA, organized in 1789, was the product of secession of the Anglican church in the colonies from the Church of England. PECUSA, an unincorporated association, is governed by a general convention and a bishop. Affiliated with it are numerous dioceses, each of which is governed by a diocesan convention and a bishop. A diocese operates missions and admits parish churches to membership in the diocese and PECUSA. Parishes are represented by their clergy and elected lay representatives in the conventions of the diocese in which they are located. Dioceses are represented in the general convention by their bishops and by elected clergy and lay representatives.

PECUSA and the Diocese of Western Michigan, with which St. Paul's Episcopal Church is affiliated, have each promulgated canons and a constitution governing church polity and church financial and spiritual matters. In 1976, the General Convention of PECUSA amended its canons to institute various doctrinal changes within the church. Defendant James R. Sharp, who had become Rector of St. Paul's Episcopal Church in 1976, and a majority of the members of St. Paul's were opposed to the changes.

At a meeting of the membership of St. Paul's on December 2, 1979, a majority present voted to delete from the parish bylaws all reference to the Protestant Episcopal Church and to the diocese constitution and canons, with the intent of seceding from the Episcopal Church and the Diocese of Western Michigan. From that date all communication between the two factions ceased; the parish report was not filed on February 1, 1980, as re-

quired by the canons, and monthly payments of assessments of the diocese ceased.

The bishop of the diocese inhibited Sharp on December 10, 1979, thereby suspending him from performing as an Episcopal priest for six months. A substitute priest, sent by the bishop on December 16, 1979, to conduct services at St. Paul's, was denied admission by defendants. The minority members of the church began meeting for worship at a temporary location.

On January 7, 1980, at the call of the bishop, the minority members held an annual parish meeting and elected plaintiffs Jones and Henry vestrymen and wardens of St. Paul's Episcopal Church.

On May 11, 1980, at a special parish meeting held by defendants and the seceding majority, a resolution was adopted to disaffiliate with the Episcopal Diocese of Western Michigan and to affiliate with the Anglican Catholic Church. A new ecclesiastical corporation was formed by the majority under MCL 450.178; MSA 21.179, in affiliation with the Anglican Catholic Church, under the name of St. Paul's Anglican Catholic Church of Grand Rapids. Defendants Brown, Slenker and Miller, who had been acting as Senior and Junior Wardens and Secretary, respectively, of St. Paul's Episcopal Church, until May 11, 1980, thereafter acted for St. Paul's Anglican Catholic Church.

On May 11, 1980, new deeds were executed conveying the subject property to the new corporation. Recordation was enjoined by the trial court pending final disposition of the case. St. Paul's Episcopal Church continues to exist as an ecclesiastical corporation.

On September 16, 1980, the status of plaintiffs Jones and Henry as vestrymen and wardens was

considered by the Bishop and the Executive Counsel of the Diocese of Western Michigan. Jones and Henry were determined to be the lawful representatives of St. Paul's Episcopal Church. By resolution the individual defendants and seceding vestrymen were declared not to be the valid and lawful officers and vestrymen of St. Paul's Episcopal Church. At the annual convention of the diocese held in October, 1980, St. Paul's Episcopal Church was represented by delegates chosen by the vestry and were officially seated after approval of their credentials.

Defendants on appeal claim: 1) genuine issues of fact exist so that summary judgment pursuant to GCR 1963, 117.2(3) was improper, 2) the trial court applied an improper legal standard in determining ownership of the property, 3) in resolving the dispute the trial court unconstitutionally interfered in ecclesiastical matters, and 4) the statutes regarding incorporation of Protestant Episcopal Churches is unconstitutional in that it impermissibly entangles the state in religious polity.

Article 1, § 4 of the Constitution of 1963 and the First and Fourteenth Amendments to the United States Constitution protect freedom of religion by forbidding governmental establishment of religion and by prohibiting governmental interference with the free exercise of religion. Without question civil courts have general authority to resolve disputes over the ownership of church property. "The State has an obvious and legitimate interest in the peaceful resolution of property disputes, and in providing a civil form where the ownership of church property can be determined conclusively." *Jones v Wolf*, 443 US 595, 602; 99 S Ct 3020; 61 L Ed 2d 775 (1979).

The First Amendment, however, "severely cir-

cumscribes the role that civil courts may play in resolving church property disputes" by prohibiting civil courts from resolving church property disputes on the basis of religious doctrine and practice and requiring that courts defer to the resolution of issues of religious doctrine or polity by the highest court of a hierarchical church organization. *Jones v Wolf,* 443 US 602. Subject to these limitations, however, the Supreme Court has held that the states are not constitutionally required by the First Amendment to follow a particular method of resolving church property disputes. "Indeed 'a State may adopt *any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith.' " *Jones v Wolf,* 443 US 602, quoting *Maryland & Virginia Eldership of the Churches of God v Church of God at Sharpsburg, Inc,* 396 US 367, 368; 90 S Ct 499; 24 L Ed 2d 582 (1970) (Brennan, J., *concurring)* (emphasis in original).

The United States Supreme Court has expressly approved of two methods by which civil courts may be guided in deciding church property disputes: 1) the polity or hierarchical theory; and 2) the neutral principles of law theory. The polity theory was set forth and approved in *Watson v Jones,* 80 US (13 Wall) 679; 20 L Ed 666 (1872), in which the Court also repudiated the "departure-from-doctrine theory".

In *Watson,* the Court classified questions concerning the rights to property held by religious bodies under three general headings: 1) property which has been, "by * * * deed * * *, or other instrument by which the property is held, by express terms of the instrument devoted to the

teaching, support or spread of some specific form of religious doctrine or belief"; 2) property held by a religious congregation "which, by the nature of its organization, is strictly independent of other ecclesiastical associations, and so far as church government is concerned, owes no fealty or obligation to any higher authority"; and 3) property held by a religious congregation or ecclesiastical body which "is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control more or less complete in some supreme judicatory over the whole membership of that general organization". 80 US 722-723.

In the absence of an express trust provision as described in the first class, where property is purchased for the use of a religious congregation, "so long as any existing religious congregation can be ascertained to be that congregation or its regular and legitimate successor, it is entitled to the use of the property". 80 US 726. In the case of an ecclesiastical body of the independent or congregational form of government, described in the second class, this identity or succession is determined "by the ordinary principles which govern voluntary associations":

"If the principle of government in such cases is that the majority rules, then the numerical majority of members must control the right to the use of the property. If there be within the congregation officers in whom are vested the powers of such control, then those who adhere to the acknowledged organism by which the body is governed are entitled to the use of the property." 80 US 725.

When determining the identity of the legitimate congregation or its successor in the case of prop-

erty within a hierarchical church, described in the third class, the Court declared:

"[W]e are bound to look at the fact that the local congregation is itself but a member of a much larger and more important religious organization, and is under its government and control, and is bound by its orders and judgments. * * *

"In this class of cases we think the rule of action which should govern the civil courts, founded in a broad and sound view of the relations of church and state under our system of laws, and supported by a preponderating weight of judicial authority is, that, whenever the questions of discipline or of faith, or ecclesiastical rule, custom or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them." 80 US 726-727.

Thus, under the polity theory, when a subordinate congregation or a faction thereof secedes from a hierarchical church, it has no right to retain church property where the governing body of the general church has determined it is no longer the congregation or its legitimate successor for which the property was originally purchased or obtained.

The Court in *Watson* repudiated the "English approach" of resolving property disputes in churches of hierarchical polity under which local property was impliedly held in trust for the general church so long as the general church adhered to the tenets of faith and practice existing at the time of affiliation by the local church. Holding that courts could not use the departure-from-doctrine test, the Court declared, in language having "a clear constitutional ring", *Presbyterian Church in the United States v Mary Elizabeth Blue Hull*

*Memorial Presbyterian Church,* 393 US 440, 446; 89 S Ct 601; 21 L Ed 2d 658 (1969):

"In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma, the establishment of no sect * * *. All who unite themselves to such a body [the general church] do so with an implied consent to [its] government, and are bound to submit to it. But it would be a vain consent and would lead to the total subversion of such religious bodies, if any one aggrieved by one of their decisions could appeal to the secular courts and have them *[sic]* reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for." 80 US 728-729.

The compulsory deference approach in *Watson* was later followed by the Court in *Serbian Eastern Orthodox Diocese v Milivojevich,* 426 US 696; 96 S Ct 2372; 49 L Ed 2d 151 (1976). In *Presbyterian Church in the United States v Mary Elizabeth Blue Hull Memorial Presbyterian Church, supra,* the Court again condemned use of the departure-from-doctrine element in resolving church property disputes, and noted that "neutral principles of law, developed for use in all property disputes * * * can be applied without 'establishing' churches to which property is awarded". 393 US 449.

In *Jones v Wolf, supra,* the Supreme Court's most recent decision in this area, the question for decision was whether civil courts "may resolve the

dispute [over the ownership of church property] on the basis of 'neutral principles of law', or whether they must defer to the resolution of an authoritative tribunal of the hierarchical church". 443 US 597. Refusing to find that the First Amendment *requires* states to adopt a rule of compulsory deference to religious authority in resolving church property disputes "even where no issue of doctrinal controversy is involved", the Court approved the resolution of litigation over religious property by application of "neutral principles of law, developed for use in all property disputes". Under this method, which clearly was approved in addition to and not required to be used in place of the *Watson* rule, resolution of a property dispute is made by reference to the language of the deeds, the terms of the local church charters, state statutes governing the holding of church property, and the provisions in the constitution of the general church concerning the ownership and control of church property. See *Jones v Wolf,* 443 US 603; *Maryland & Virginia Eldership of the Churches of God v Church of God at Sharpsburg, Inc, supra.*

Justice Blackmun, writing for the majority in *Jones,* rejected the dissent's argument that the constitution requires the rule of compulsory deference:

"The dissent suggests that a rule of compulsory deference would somehow involve less entanglement of civil courts in matters of religious doctrine, practice, and administration. Under its approach, however, civil courts would always be required to examine the polity and administration of a church to determine which unit of government has ultimate control over church property. In some cases, this task would not prove to be difficult. But in others, the locus of control would be ambiguous, and '[a] careful examination of the constitutions of the general and local church, as well as other

relevant documents, [would] be necessary to ascertain the form of governance adopted by the members of the religious association.' 443 US 619-620. In such cases, the suggested rule would appear to require 'a searching and therefore impermissible inquiry into church polity.' *Serbian Orthodox Diocese,* 426 US 723. The neutral-principles approach, in contrast, obviates entirely the need for an analysis or examination of ecclesiastical polity or doctrine in settling church property disputes." 443 US 605.

In concluding that the right to use and control of the church property remained with the minority who, with the express authority of the diocesan bishop, continued to represent St. Paul's Episcopal Church, the trial court relied primarily on the hierarchical theory, which it found to be consistent with the approach traditionally sanctioned by Michigan courts in resolving such disputes. Defendants argue, however, that whether the Episcopal church is in fact hierarchical is an issue of fact disputed by the parties which should have precluded summary judgment under GCR 1963, 117.2(3). While defendants concede the church is hierarchical with regard to "doctrinal and spiritual matters", they argue it has a "congregational structure in temporal, property matters".

We conlcude, however, that the undisputed facts show the Protestant Episcopal Church to be hierarchical with regard to property, as well as spiritual matters.

When ruling on a motion for summary judgment under GCR 1963, 117.2(3), the affidavits, pleadings, depositions, and other documentary evidence must be considered by the court. *Bob v Holmes,* 78 Mich App 205; 259 NW2d 427 (1977). The party opposing the motion must come forward with some proof to establish the existence of an issue of material fact. *Bob v Holmes, supra.*

The undisputed evidence reveals that St. Paul's Episcopal Church has considered itself part of PECUSA and acquiesced in its policies, as well as the policies of the Diocese of Western Michigan, from the time of its incorporation in 1901 until the present dispute arose. Bishop Bennison testified that the Episcopal Church is hierarchical in nature and that the national canons supersede diocesan canons, which themselves supersede parish bylaws.

The canons of the general church state that "[e]very Congregation of this Church shall belong to the Church in the Diocese in which its place of worship is situated". Title I, Canon 12, § 1. The election of parish wardens is specifically made subject to the law of the diocese, and members of the parish vestry are declared to be the agents and legal representatives of the parish in all matters concerning its corporate property. Title I, Canon 13.

In Article I of the diocesan constitution, the diocese declares it is a constituent of PECUSA and "accedes to the doctrine, discipline, worship, constitution, canons and authority of that Church". Title II, Canon 2 of the diocesan canons provides that all bylaws adopted by any parish "shall be consistent" with the constitution and canons of the General Convention and of the diocese. Title II, Canon 3 sets forth in detail rules governing elections of the parish vestry, its meetings, and its duties with regard to the parish's financial affairs and property. The vestry is empowered to sell and convey, or mortgage real estate of the parish "but only pursuant to written consent of the Bishop and Standing Committee, first obtained". Title II, Canon 6 limits the extent to which indebtedness may be incurred by a parish without approval of the Bishop and Standing Committee.

No material fact was adduced by defendants which could lead the trial court to find that the Protestant Episcopal Church is not hierarchically structured. The test of *Watson,* that a religious organization is but a subordinate part of a general church in which there are superior ecclesiastical tribunals with a more or less complete power of control, is plainly met here. The trial court correctly found that the Protestant Episcopal Church is hierarchically structured as a matter of law.[1] Having correctly concluded PECUSA is hierarchical, the trial court correctly determined, under the rule in *Watson,* that control of the property should remain with the minority, who were determined by higher authority within the hierarchical church to properly represent the congregation for which the property was purchased.

Defendant's contention that the trial court's determination that the Episcopal Church is hierarchical required a searching inquiry into church polity, which the Court in *Jones v Wolf, supra,* suggested would be constitutionally impermissible, is without merit. The locus of control over church property is apparent from a brief review of the church's polity and administration; no searching inquiry into church polity was necessary or made. The inquiry in this case was no more intrusive than that made by the Maryland Court of Appeals, in applying neutral principles of law, in *Maryland*

---

[1] At least two other courts have concluded PECUSA is hierarchical. *Protestant Episcopal Church in the Diocese of New Jersey v Graves,* 161 NJ Super 230; 391 A2d 563 (1978), *aff'd per curiam* 167 NJ Super 563; 401 A2d 548 (NJ App Div, 1979), *aff'd with opinion* 83 NJ 572; 417 A2d 19 (1980), *cert den* 449 US 1131 (1981); *Tea v Protestant Episcopal Church in the Diocese of Nevada,* 610 P2d 182 (Nev, 1980). *Cf. Protestant Episcopal Church in the Diocese of Los Angeles v Barker,* 115 Cal App 3d 599; 171 Cal Rptr 541 (1981), *cert den* 454 US 864 (1981), where the California Court of Appeals, in rejecting application of the hierarchical theory in favor of that of neutral principles, appeared to assume PECUSA is hierarchical.

*& Virginia Eldership of the Churches of God, supra,* in which the Supreme Court, noting that the Maryland court's resolution of the dispute involved no inquiry into religious doctrine, dismissed the appeal for want of a substantial federal question.

Defendants' claim that an issue of fact existed as to whether plaintiffs Jones and Henry were qualified as the wardens of St. Paul's Episcopal Church is without merit. The determination of the bishop conclusively established this fact. *Serbian Eastern Orthodox Diocese v Milivojevich,* 426 US 696; 96 S Ct 2372; 49 L Ed 2d 151 (1976).

Defendants argue that the trial court should have resolved the instant dispute by application of "neutral principles of law", rather than the theory of hierarchy, which they suggest would result in judgment in their favor. Defendants rely upon *Protestant Episcopal Church in the Diocese of Los Angeles v Barker,* 115 Cal App 3d 599; 171 Cal Rptr 541 (1981), *cert den* 454 US 864; 102 S Ct 323; 70 L Ed 2d 163 (1981), which involved a property dispute between PECUSA and four seceding local churches.

In *Barker,* the California Court of Appeals rejected application of the hierarchical theory, except where doctrinal and ecclesiastical disputes are involved, and held that property disputes between ecclesiastical claimants, like property disputes between temporal claimants, must be resolved by neutral principles of law. Based upon the conclusion that nothing in the articles of incorporation of three of the local churches, the constitution, canons and rules of the diocese or general church, or state statutes, created an express trust in church property for the benefit of the diocese or PECUSA, the court determined the local churches, in whose

name record title was held, were entitled to the property.

The California court's choice of neutral principles of law rested on the court's review of prior California decisions which it found placed "California law squarely in the neutral-principles camp". 115 Cal App 3d 614; 171 Cal Rptr 549. Our review of Michigan law, however, reveals that application of the hierarchical theory in this case is not inconsistent with the reasoning and result in decisions in such matters by the Michigan Supreme Court.

The Michigan Supreme Court has "repeatedly recognized the rule that judicial interference *in the purely* ecclesiastical affairs of religious organization is improper". *Berry v Bruce,* 317 Mich 490, 499; 27 NW2d 67 (1947). "[W]here the determination has been made that the church is one of a representative form of government the Court will not interfere in any manner with the decisions of the governing body except to determine whether the governing body had jurisdiction to do what it did." *Immanuel Evangelical Lutheran Church v Fromm,* 367 Mich 575, 589; 116 NW2d 766 (1962).

In *Fuchs v Meisel,* 102 Mich 357, 373-374; 60 NW 733 (1894), quoted with approval in *Borgman v Bultema,* 213 Mich 684; 182 NW 91 (1921); *Hanna v Malick,* 223 Mich 100, 117-118; 193 NW 798 (1923); and *Colin v Iancu,* 82 Mich App 521, 529; 267 NW2d 438 (1978), *lv den* 404 Mich 815 (1979), among other cases, the Supreme Court stated:

"In the freedom of conscience and the right to worship allowed in this country, the defendants and the members of this church undoubtedly possessed the right to withdraw from it, with or without reason. But they could not take with them, for their own purposes, or

transfer to any other religious body, the property dedicated to and conveyed for the worship of God under the discipline of this religious association; nor could they prevent its use by those who choose to remain in the church, and who represent the regular church organization. If complainants maintain the allegations of their bill,—that they represent the regularly organized body of the church, and are its regular appointees,—they are entitled to the relief prayed."

Writing for the Court in *Davis v Scher,* 356 Mich 291, 298; 97 NW2d 137 (1959), Justice KAVANAGH stated:

"The weight of authority in Michigan is to the effect that the majority faction of a local congregation or society, being one part of a large church unit, however regular its action or procedure in other respects, may not, as against a faithful minority, divert the property of the society to another denomination or to the support of doctrines fundamentally opposed to the characteristic doctrines of the society, although the property is subject to no expressed trust."

In *Michigan Congregational Conference v United Church of Stanton,* 330 Mich 561, 575; 48 NW2d 108 (1951), the Court summarized:

"It is the well-established law of this State, declared in *Fuchs v Meisel [supra]; Borgman v Bultema [supra];* and *United Armenian Brethren Evangelical Church v Kazanjian,* 322 Mich 651 [34 NW2d 510 (1948)], that while members of a church undoubtedly possess the legal right to withdraw from it, with or without reason, they may not, in so doing, take with them, for their own purposes, or transfer to any other religious body, property previously conveyed to, or dedicated to the use of, the religious denomination from which they are withdrawing or one of its member churches, but such property must remain for the use and benefit of adherents to that denomination or those who represent it."

724 Mich App 705 [Dec

Under these decisions, as under *Watson,* although the majority faction of a local congregation within a hierarchical church may secede, it may not take property with it. To the extent language in these decisions appears to sanction use of the departure-from-doctrine test they are, of course, no longer authoritative in light of *Watson* and *Blue Hull Church, supra.* The trial court in this case, although referring to these decisions, made no inquiry into or determination regarding which faction adhered to the tenets of faith and practice existing at the time of the affiliation by the local church. Religious doctrine and practice played no part in the decision.

We do not mean to suggest that neutral principles of law should never be applied to resolve church property disputes in Michigan, nor do we necessarily agree with defendants that a different result would be required upon application of that theory in the instant case. Where, for example, it appears from the church constitution, canons or rules, or from some other source, that an express trust exists in favor of one or the other of the contending parties, application of neutral principles of law would be appropriate. See, *e.g., Colin v Iancu, supra,* where the court relied on both neutral principles and Michigan precedent reflecting the polity theory.

In the absence of any evidence of express trust in *Barker,* the California court was forced to rely, in effect, on bare legal title of the property and held the seceding local churches in whose name title was held were entitled to the property in issue. We agree with the dissenting judge in that case that the best choice in such a situation where there is no express trust "is that approach which comes closest to recognizing those factors which

define the nature of the relationship of the parties and therefore are best calculated to indicate what was contemplated by them in arriving at and agreeing upon that relationship". 115 Cal App 3d 628; 171 Cal. Rptr 557. In the instant case, the hierarchical structure of PECUSA is the controlling consideration.

We also observe that, were we to follow the approach of the court in *Barker, supra,* the result in this case would be identical to that upon application of the polity theory. Possession of the property in question here is sought not by a seceding ecclesiastical corporation in whose name title rests, as was the case in *Barker,* but by a majority of members of that corporation who have seceded and formed a new and distinct organization. As St. Paul's Episcopal Church continues to exist as a corporate entity, title and control over the property remains with it.

Finally, we reject defendants' claim that the statute under which St. Paul's Episcopal Church was incorporated, MCL 458.251 *et seq.;* MSA 21.1851 *et seq.,* is unconstitutional in that it impermissibly entangles the state in religious polity by codifying the constitution, canons and doctrines of the Protestant Episcopal Church, forcing local churches to accept in advance any ecclesiastical rules and doctrinal changes the denomination may make subsequent to its incorporation. The United States Supreme Court has approved reference to state incorporation statutes in order to resolve church property disputes. *Maryland & Virginia Eldership, supra; Jones v Wolf, supra.* The statutes in question merely protect the autonomy and hierarchical polity of the Protestant Episcopal Church.

While the statutes might, conceivably, be unconstitutionally applied, we observe that no reference

to the statutes has been necessary for resolution of the instant dispute. Assuming *arguendo* that the statutes are invalid for any reason, such invalidity would be of no assistance to defendants in this case. Having determined the church is hierarchical, and that there is no express trust in favor of defendants, no further inquiry need be made.[2]

The decision of the trial court is affirmed.

---

[2] Given our resolution of the issues herein, we need not address the propriety of the trial court's determination that defendants did not effectuate severance from the Episcopal Church until May 11, 1980, and that they were therefore bound by the new canon of the Episcopal Church, enacted on January 1, 1980, providing that all real property held by any local parish is held in trust for the general church and the diocese in which such parish is located.