*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

THE ROMANIAN ORTHODOX EPISCOPATE OF AMERICA,

        Plaintiff/Counterdefendant-Appellee,

v

ESTATE OF GHEORGHE CARSTEA and ST. NICHOLAS AND VEN PARASCHEVA ROMANIAN ORTHODOX CHURCH,

        Defendants/Counterplaintiffs-Appellants.

UNPUBLISHED
September 15, 2022

No. 358653
Oakland Circuit Court
LC No. 2018-168095-CZ

Before: RONAYNE KRAUSE, P.J., and JANSEN and SWARTZLE, JJ.

PER CURIAM.

Defendants appeal as of right the trial court judgment quieting title to disputed property in favor of plaintiff after granting plaintiff's motion for summary disposition under MCR 2.116(C)(10). We affirm.

## I. FACTS AND PROCEEDINGS

Plaintiff is a diocese within the Orthodox Church of America ("OCA"), which is associated with the Romanian Orthodox religion. Gheorghe Carstea is a priest who plaintiff appointed to the parish originally known as St. Nicholas Monastery, but later known as St. Nicholas Romanian Orthodox Church ("SNROC"). In 2017, most members of SNROC defected from plaintiff after Carstea was disciplined and laicized by church authorities. Carstea and his supporters formed a new entity, defendant St. Nicholas Ven Parascheva Romanian Orthodox Church ("SNVPROC"). Plaintiff brought this action against Carstea[1] and SNVPROC to establish ownership of real

---

[1] Carstea died after this action was filed and is now represented by his estate.

property in Troy that was purchased by SNROC. Plaintiff claimed ownership of the property under church laws that prohibit defecting parishes from retaining church property.

The OCA is governed by The Statute of the Orthodox Church in America (the "Statute"), dated May 4, 2015. The Statute defines the OCA as "an autocephalous Church with territorial jurisdiction in the United States of America," Canada, and Mexico. Statute, Art I, p 2. The Holy Synod is "the supreme canonical authority" in the OCA. Statute, Art II, p 3. The diocese is "the basic Church body which unites Parishes and institutions, usually in a defined geographical area, under the authority of a Diocesan Bishop." Statute, Art VII, p 21. A parish is "a local Orthodox Eucharistic community canonically established by and subject to the authority of the Diocesan Bishop." Statute, Art XII, Section 1.a, p 36. "The organization and administration of a Parish are subject to the Statute, the statute or Bylaws of the Diocese, and the Parish Bylaws approved by the Diocesan Authority." Statute, Art XII, Section 1.b, p 36. "The Orthodox Church in general and The Orthodox Church in America in particular are hierarchical in structure." Statute, Art XII, Section 1.b, p 36. The Statute makes these provisions regarding parish property:

> a. The Parish corporation holds legal title to all Parish property, assets, and funds. In administering them, the Parishioners and the officers elected by them must always remember the religious nature, purposes, and goal of the Parish and act as trustees of such property dedicated to the service of God and the use of the Church.

> b. All Parish property, assets and funds are and shall be owned and held by the Parish or Parish corporation in trust for the use, purpose, and benefit of the Diocese of The Orthodox Church in America of which it is a part. This provision shall not limit the authority of the Parish or Parish corporation in its administration of such property, assets, and funds in accord with the faith, governance, and discipline of The Orthodox Church in America.

> c. In the event the Diocese shall be dissolved or attempt to disaffiliate from The Orthodox Church in America in a disorderly manner, all Parish property, assets and funds of such Diocese are and shall remain subject to the use, purpose, and benefit of The Orthodox Church in America.

> d. If the Parish is canonically suppressed or otherwise ceases to exist, its real and personal property shall be disposed of in accord with Section 9, b, above. . . . . [Statute, Art XII, Section 9, p 42.]

Plaintiff has its own Constitution and By-Laws of the Romanian Orthodox Episcopate of America (CBL), adopted July 2, 1994. The CBL provides that plaintiff is "under the jurisdiction and canonical authority of the Holy Synod of the Orthodox Church in America, an Autocephalous Church with territorial jurisdiction in North America." CBL, Art III(b), pp 1-2. Plaintiff's CBL "shall be incorporated into the Corporate Charter or articles of each Parish by reference . . . ." CBL, Art IX, Section 4(b). "In the event of a conflict between the Articles or By-Laws of a Parish and the Episcopate's Constitution and By-Laws, the latter shall be controlling." CBL, Art IX, Section 4(b).

Plaintiff's CBL provides that "[c]hurch properties of any kind, nature and description cannot be sold, alienated, or mortgaged without the written permission of the Episcopate Council." CBL, Art VI(a), p 3. Regarding parish property, the CBL provides:

> Each Parish shall be legally organized and incorporated or chartered to the extent allowed by law as a religious, nonprofit organization, and shall own and control its personal and real property. In administering this property, the parishioners, parish priest and the officers elected by them must administer according to the religious nature, purposes and goals of the Parish and act as trustees of God's property, not man's. The Parish serves God and cares for God's work in the world, as does the whole Church, and all decisions concerning Parish administration must be inspired by that care and by the spiritual needs of the Church. [CBL, Art IX, Section 4(a), p 28.]

Plaintiff is authorized to record its CBL with the land title register of the local government in which parish real property is located. CBL, Art IX, Section 4(c), p 29. "In the event of the dissolution of a Parish, title to all of its properties, real and personal, . . . shall immediately vest in and pass to the patrimony of the Episcopate." CBL, Art IX, Section 10(a), p 30. "In the event of heresy, schism or defection from the Episcopate, that segment of the Parish, even if it be a single member, which remains loyal to, and determines to remain within the Episcopate, shall retain title to the Parish property of every kind, nature, and description." CBL, Art IX, Section 11, p 31.

St. Nicholas Monastery filed with the state the original articles of ecclesiastical association on October 6, 1955. The documents named the entity "St. Nicholas Monastery" and described it as a "Romanian Orthodox Monastery and Charitable Religious Institution" under the "discipline, rules and usage" of the "Romanian Orthodox Church of Romania" and the "Eastern Christian Orthodox Church of America." In 1970, St. Nicholas was accepted as a participating parish in plaintiff episcopate. Plaintiff appointed Carstea as parish priest to SNROC in 1988. Upon his appointment, he executed an oath declaring that he would "remain loyal to the teachings, traditions and canon laws of the Holy Orthodox Church, and will conduct myself and lead the parish in accordance with the Constitution and By-Laws of the Roman Orthodox Episcopate of America . . . ."

In 1990, SNROC entered into a land contract with the Metro Detroit Chinese Christian and Missionary Alliance Church for purchase of the subject property. The terms of the land contract were fulfilled in 2014, and the seller issued a warranty deed to St. Nicholas Romanian Orthodox Church. SNROC filed amended articles of incorporation in 2014. The amendment to Article 7 provided for distribution of its assets upon "dissolution of the corporation," stating, "Provided that the Romanian Orthodox Episcopate of America, or its successor, is a 501(c)(3)[2] organization, title to all of the Church properties, real and personal . . . shall immediately vest in and pass to the patrimony of the Episcopate."

---

[2] This references refers to § 501(c)(3) of the Internal Revenue Code.

In 2016, a past president of SNROC's parish council filed a complaint with plaintiff that Carstea kept a secret bank account in the parish's name, but listed under Carstea's home address. Plaintiff's Spiritual Consistory investigated complaints of Carstea's alleged financial misconduct. The Spiritual Consistory found Carstea guilty of 12 charges of financial improprieties. The Holy Synod of the OCA notified Carstea that he was divested of all authority within the parish, plaintiff, and the OCA. Plaintiff suspended and laicized Carstea. Carstea resigned his membership from plaintiff in correspondence dated January 13, 2017. While the charges against Carstea were pending, plaintiff became concerned that Carstea and parishioners who were loyal to him would attempt to take the subject property. Plaintiff recorded an Affidavit Regarding Event Affecting Interest in Land with the Oakland County Register of Deeds to protect its rights to the subject property. Attached to the affidavit were excerpts from plaintiff's CBL regarding sale of church property. Defendants informed the archbishop that 198 voting members out of a total of 216 present at a meeting had voted to withdraw from the episcopate. Defendants declared themselves separated from plaintiff.

Carstea filed Articles of Incorporation with the Michigan Department of Licensing and Regulatory Services for SNVPROC as a new ecclesiastical corporation named St. Nicholas and Ven Parascheva Romanian Orthodox Church, using the subject property's address as SNVPROC's address. Plaintiff filed the instant lawsuit to quiet title on August 28, 2018. Defendants filed a countersuit. After plaintiff filed suit, Alexandru Vulcu, Costel Ivanciu, and Cornel Vulcu executed a consent resolution purportedly on behalf of SNROC, in which they resolved that the subject property would be conveyed to SNVPROC. They then executed and recorded a quitclaim deed transferring the property to SNVPROC.

Both parties moved for summary disposition under MCR 2.116(C)(10). The trial court determined that the dispute should be resolved under neutral legal principles rather than under the ecclesiastical abstention doctrine. The court concluded that defendants had no authority to transfer the subject property from SNROC to SNVPROC without plaintiff's consent. Accordingly, the court quieted title to the property in plaintiff's favor, but granted defendants' motion to stay execution of the order.

## II. QUIET TITLE

Defendants argue that the trial court misapplied neutral principles and wrongly concluded that SNVPROC did not acquire valid title to the subject property. Plaintiff argues that the trial court erred by not applying the ecclesiastical abstention doctrine, but asserts that it is entitled to the property under either approach.

A quiet-title action is equitable in nature. *Federal Home Loan Mortgage Corp v Werme*, 335 Mich App 461, 470; 966 NW2d 729 (2021). This Court reviews equitable actions de novo, "but the trial court's factual findings are reviewed for clear error." *Canjar v Cole*, 283 Mich App 723, 727; 770 NW2d 449 (2009). But because the trial court decided this matter in the context of motions for summary dispositions, we review the trial court's decision de novo, applying the standards applicable to a motion for summary disposition. "Under MCR 2.116(C)(10), summary disposition is appropriate if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *Piccione v Gillette*, 327 Mich App 16, 19; 932 NW2d 197 (2019) (quotation marks and citation omitted). This Court "must review the pleadings,

admissions, and other evidence submitted by the parties in the light most favorable to the nonmoving party." *Id*. (quotation marks and citation omitted). "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *Id*. (quotation marks and citation omitted). "A court may not make findings of fact; if the evidence before it is conflicting, summary disposition is improper." *Id*. (quotation marks, citation, and emphasis omitted).

In *Winkler v Marist Fathers of Detroit, Inc*, 500 Mich 327, 337-338; 901 NW2d 566 (2017), our Supreme Court stated:

> The ecclesiastical abstention doctrine arises from the Religion Clauses of the First Amendment of the United States Constitution and reflects this Court's longstanding recognition that it would be "inconsistent with complete and untrammeled religious liberty" for civil courts to "enter into a consideration of church doctrine or church discipline," to "inquire into the regularity of the proceedings of church tribunals having cognizance of such matters," or "to determine whether a resolution was passed in accordance with the canon law of the church, except insofar as it may be necessary to do so, in determining whether or not it was the church that acted therein." *Van Vliet v Vander Naald*, 290 Mich 365, 370-371; 287 NW 564 (1939). . . . Accordingly "[w]e have consistently held that the court may not substitute its opinion in lieu of that of the authorized tribunals of the church in ecclesiastical matters," *First Protestant Reformed Church v De Wolf*, 344 Mich 624, 631; 75 NW2d 19 (1956), and that "judicial interference in the purely ecclesiastical affairs of religious organizations is improper." *Berry v Bruce*, 317 Mich 490, 499; 27 NW2d 67 (1947).

In *Bennison v Sharp*, 121 Mich App 705, 709; 329 NW2d 466 (1982), St. Paul's Episcopal Church of Grand Rapids was affiliated with the Protestant Episcopal Church in the United States of America (PECUSA). A majority of the St. Paul congregation voted to secede from PECUSA and affiliate with the Anglican Catholic Church. *Id*. The PECUSA Diocese of Western Michigan filed suit to enjoin the transferring church members from transferring property from St. Paul's Episcopal Church to St. Paul's Anglican Church. *Id*. This Court held that there was no genuine issue of material fact that PECUSA was hierarchical in nature, because it was governed by national canons that superseded diocesan canons, which themselves superseded parish bylaws. *Id*. at 719-720. The plaintiff diocese acceded to the doctrine and discipline of the PECUSA. *Id*. at 719. The diocesan rules empowered parish authorities to convey parish property, but only with the written consent of the bishop. *Id*. Accordingly, the parish property remained with the minority of St. Paul parishioners who submitted to the hierarchical church's higher authorities. *Id*. at 720. This Court rejected the defendants' argument that the dispute should be resolved by neutral principles of law, rather than the theory of hierarchy. *Id*. at 724. However, this Court determined that if it were to follow neutral principles, the outcome would be the same because the defendants were not "a seceding ecclesiastic corporation in whose name title rests, . . . but by a majority of members of that corporation who have seceded and formed a new and distinct organization." *Id*. at 725. This Court stated, "As St. Paul's Episcopal Church continues to exist as a corporate entity, title and control over the property remains with it." *Id*.

In this case, OCA is a hierarchical organization in which the diocese's and parish's obligations to each other and to other authoritative bodies within the church are defined by church statutes, constitutions, and bylaws. Accordingly, the trial court erred by deciding this matter under neutral principles. However, the "[a] trial court's ruling may be upheld on appeal where the right result issued, albeit for the wrong reason." *Gleason v Mich Dep't of Transp*, 256 Mich App 1, 3; 662 NW2d 822 (2003). Plaintiff determined that the Vulcus and Ivanciu had no authority to convey SNROC's property. Although there was no direct formal decision declaring that SNROC was dissolved, or that Carstea, the Vulcus, and Ivanciu caused a schism, defected, or perpetrated heresy, plaintiff relieved Carstea of his priestly authority. Defendants clearly indicated that they rejected plaintiff's authority and that they chose to act independently of plaintiff's discipline. These events clearly established that Carstea and his supporters could no longer exercise authority over SNROC's assets or invoke SNROC's status within plaintiff and the OCA for the benefit of SNVPROC. Defendants emphasize that SNROC purchased and developed the property without assistance from plaintiff. However, defendants abandoned SNROC and formed a new organization. Defendants therefore failed to establish a genuine issue of material fact that SNVPROC acquired legal title to the subject property. Defendants' argument that SNROC is a monastery instead of a parish does not require a different analysis or compel a different result, because monastery property is subject to the same conditions under Article XIII, Section 4(a)-(b) of the Statute.

Moreover, even if this case were to be resolved by neutral principles, the same result would ensue. Any authority that Carstea, the Vulcus, and Ivanciu had to act on SNROC's behalf was derived from the Statute and CBL. The Statute gave plaintiff the right to record its CBL with the land title register of the local government in which parish real property is located. CBL, Art IX, Section 4(c), p 29. Carstea, the Vulcus, and Ivanciu did not comply with the Statute and CBL when they passed the resolution to convey the property to SNVPROC. Thus, if the Statute and CBL governed the contractual relationship between defendants and plaintiff, the transfer was not valid. The defecting individuals and their new corporation are analogous to the majority of St. Paul's Episcopal Church members in *Bennison*, 121 Mich App at 709, who departed to form St. Paul's Anglican Church. They therefore were not "a seceding ecclesiastic corporation in whose name title rests, . . . but by a majority of members of that corporation who have seceded and formed a new and distinct organization." *Id*. at 725. Accordingly, the outcome would be the same under a neutral-principles approach.

III. JOINDER OF PARTIES

Defendants also argue that the trial court erred by quieting title without SNROC's nondefecting members being joined as parties to this action. Defendants argue that these parishioners had rights to the subject property under the Statute and the CBL, and that these rights were infringed upon by the trial court's order quieting title in plaintiff's favor. Because defendants did not raise this issue in the trial court, the issue is unpreserved. *Glasker-Davis v Auvenshine*, 333 Mich App 222, 227; 964 NW2d 809 (2020). This Court reviews unpreserved claims of error for plain error affecting substantial rights. *Whitmer v Bd of State Canvassers*, 337 Mich App 396, 412; 976 NW2d 75 (2021).

MCR 2.205(A) provides that "persons having such interests in the subject matter of an action that their presence in the action is essential to permit the court to render complete relief

-6-

must be made parties and aligned as plaintiffs or defendants in accordance with their respective interests." Defendants argue that the parishioners who opposed defection from plaintiff were necessary parties to these proceedings because Art IX, Section 11, p 31, of the CBL provides that the loyal "segment of the Parish, even if it be a single member, which remains loyal to, and determines to remain within the Episcopate, shall retain title to the Parish property of every kind, nature, and description." Defendants argue that the loyal members should have been joined as parties to this case because their rights under this provision were jeopardized by the trial court's order quieting title in plaintiff's favor. Plaintiff argues that their inclusion as parties was unnecessary because their interests are intertwined with plaintiff's interest.

It is unnecessary to determine the nondefecting parishioner's rights in this appeal because any error relating to their nonjoinder does not affect defendants' substantial rights. Indeed, a party must assert his own legal rights and interests and cannot rest a claim for relief on the legal rights or interests of third parties. *Barclae v Zarb*, 300 Mich App 455, 483; 834 NW2d 100 (2013). Accordingly, defendants are not entitled to relief with respect to this unpreserved issue.

Affirmed. Accordingly, the November 3, 2021 trial court order staying its final judgment is vacated.

/s/ Amy Ronayne Krause
/s/ Kathleen Jansen
/s/ Brock A. Swartzle