Rev. Vasil KENDYSH, Secretary of the Consistory of the Byelorussian Autocephalous Orthodox Church, individually and as such officer and representative of the members of said denomination, Plaintiff,

v.

HOLY SPIRIT BYELORUSSIAN AUTO-CEPHALIC ORTHODOX CHURCH, a Michigan Corporation, Bazyli Pleskacz, and Manufacturer's National Bank of Detroit, a National Banking Corporation, Defendants.

Civ. A. No. 83–1906.

United States District Court,
E.D. Michigan, S.D.

June 18, 1987.

Valentine N. Horoshko, New York City, Gary Price, Birmingham, Mich., for plaintiff.

Cass S. Jaros, Michael R. Main, Michael D. Boutell, Christian C. Nilson, Eric C. Oppenheim, Detroit, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER

JULIAN ABELE COOK, Jr., District Judge.

The trial of the instant cause was held from May 26 to May 28, 1987. Pursuant to *Fed.R.Civ.P.* 52, the Court now enumerates its "Findings of Fact" and "Conclusions of Law." The Court has jurisdiction under 28 U.S.C. § 1332.[1]

---

1. The Plaintiff is a citizen of Massachusetts. The Defendants are citizens of Michigan. The amount in controversy exceeds $10,000. By stipulation, the Defendant, Manufacturers National Bank, did not appear at trial and agreed

## FINDINGS OF FACT

The Plaintiff, Reverend Vasil Kendysh,[2] is the Secretary of the Consistory of the Byelorussian Autocephalic Orthodox Church (BAOC). The BAOC was founded in Germany in 1948, adheres to the tenets, canons, doctrine and tradition of the Holy Ecumenical Apostolic Church, and maintains parishes in the United States, Europe, Canada, and Australia. The Consistory is an intermediate administrative ecclesiastical judicatory of the denomination with duties that include a general responsibility for church property.

The Defendant, Holy Spirit Byelorussian Autocephalous Orthodox Church (Holy Spirit Church), is an ecclesiastical corporation which was organized under the laws of the State of Michigan on May 10, 1971, with its principal office at 14861 Collison, East Detroit, Michigan. The Defendant, Bazyli Pleskacz, is the Secretary of the Holy Spirit Church. The Defendant, Manufacturer's National Bank of Detroit (MNB), is a national banking corporation which conducts its business in the State of Michigan.

At the trial, Archbishop Mikalay,[3] whom the Holy Spirit Church recognizes as its spiritual leader, and Joseph Sazyck, the current President of the Holy Spirit Church Council, testified that the Holy Spirit Church began in 1967 as a fellowship of likeminded people in the Detroit area who conducted religious services in their own private homes. In 1971, the group purchased a church building for $25,000,[4] which was derived from contributions from persons who became "founders" of the Holy Spirit Church. Subsequently, the Holy Spirit Church acquired another parcel of realty,[5] which was adjacent to the first parcel and served as a Rectory.[6]

In May 1971, the fellowship became incorporated under the title of the Holy Spirit Byelorussian Autocephalic Orthodox Church.[7] Pleskacz, Sazyck, and Walter Bakunovich signed the Articles of Association on behalf of the Holy Spirit Church. Paragraph Fourth of the Articles of Association reads:

> The members of said church or society shall worship and labor together according to the discipline, rules and usage of the Holy Apostolic Oecumenical Orthodox church in the United States of America (or other jurisdiction as the case may be), as from time to time authorized and declared by the NONE
>
> ---
>
> (Here Insert the name of the higher ecclesiastical body or bodies, if any, authorized to determine such question).

(Lines in original). The Defendants assert that this provision demonstrates their independence from the BAOC. The Holy Spirit Church adopted a set of By Laws, many of which reflect a strong affiliation to the BAOC. However, those provisions which relate to property (to wit, paragraphs 18

---

to remit the funds in controversy to whomever the Court directs.

2. Kendysh appears in his individual and representative capacities.

3. The BAOC disputes Mikalay's authority to use the "Archbishop" title. This Court does not make any judgment, expressed or implied, regarding the merit of the BAOC's contention. This is clearly a church matter. The Court has utilized the name by which he was identified during trial.

4. According to the warranty deed, the property is described as follows:
   Lot 51 of Eastwood Manor, a subdivision of a part of the Southwest 1/4 of Section 31, Town 1 North, Range 13 East, Erin Township, and a part of the Southeast 1/4 of Section 36, Town 1 North, Range 12 East, Warren Township, Macomb County, Michigan, according to the Plat thereof as recorded in Liber 6 of Plats, Page 38, Macomb County Records.

5. The Quit Claim Deed describes the property as "Lot 52, of Eastwood Manor Subdivision as recorded in Liber 6, Page 38 of Plats, Macomb County Records."

6. Both deeds place the title to the respective properties in the Holy Spirit Church. Neither instruments make any reference to the BAOC.

7. The Articles of Association were filed with the Michigan Department of State on May 10, 1971. Pleskacz, Sazyck, and Walter Bakunovich signed the Articles of Association on behalf of the Holy Spirit Church.

and 20), indicate that a retention of interest by the local parish was intended.[8]

On May 28, 1972, the BAOC convened a convention for the purpose of (1) formalizing the relationship between the BAOC and its various parishes throughout the world, and (2) selecting a primate of the Church.[9] Notice of the convention was sent to each of the parishes one or two months in advance.

There was much dispute between the parties as to whether John Brucky and Bakunovich were convention delegates of the Holy Spirit Church or were merely interested individuals who had attended the sessions without official credentials. Bakunovich, in claiming to have paid his own expenses, asserts that he was not a representative of the Holy Spirit Church at the convention. However, Brucky noted that he and Bakunovich had exercised their voting privileges as convention delegates of the Holy Spirit Church. Although Brucky claims that his right to appear at the convention as a delegate was verified by a convention committee, he was unable to produce the letter which was ostensibly used by him to establish his credentials. Mikalay, who also attended the convention, testified that Kendysh had made Brucky and Bakunovich the Detroit representatives.

The Court finds Bakunovich's assertions on this point to be highly questionable. Although he and Brucky may not have been formally elected by the Holy Spirit Church to serve as delegates to the conven-

tion, it is clearly evident that they did act in such capacities. Certainly, there is nothing to indicate that Bakunovich objected to such a designation at the convention. This was a convention, which was convened to create, *inter alia*, a Constitution for the BAOC. It is not plausible to think that non-representatives or unofficial individuals would be allowed to participate in such an historic event.

Indeed, the minutes of the convention demonstrate that Brucky and Bakunovich were significant participants.[10] For instance, page 4 of the minutes, which identifies all of the convention delegates, lists Brucky and Bakunovich from the "parish in Detroit." On page 1, the minutes indicate that Bakunovich was elected to the important role of Secretary to the convention. However, it should be noted that he did not recall such an election when queried during the trial. This Court finds his response to be devoid of credibility in view of the significance of the election and his obvious desire to minimize his role at the convention. Bakunovich and Brucky were also selected to serve on the BAOC Council at the convention. In addition, Brucky, as a lay delegate, was also unanimously elected to the presidium of the convention. The record certainly indicates that each of these men acted as if they had the authority to represent the Holy Spirit Church despite Bakunovich's disclaimer. Accordingly, this Court determines that Brucky and Bakunovich served as delegates to the convention as representatives of the Holy Spirit Church.

8.  These paragraphs read as follows:
    18.  The parish property shall consist of:
        a) Parish buildings with all accessories and religious articles for ecclesiastical use
        b) personal and real estate bought or donated to the church
    20.  Only the Hierarchy of the B.A.O.C. shall have the power to resolve and terminate the existence of the parish.
    Liquidation of all real and personal property shall take place only at the request of a two-thirds majority of the founders or their descendents. Distribution of the property of the parish or the proceeds from their sale shall be subject to the decision of the founders at the time of liquidation.
    A founder is defined as the original contributor of $1,000 for the church building fund and

holder of a special certificate issued by the Parish Council before April 29, 1971 signed by the President, Secretary and Treasurer of the Parish Council.
Religious articles, books and archives shall be turned over to the Ruling Bishop of the parish of the B.A.O.C.

9.  Two members of the Holy Spirit Church (Bakunovich and John Brucky, now Metropolitan Isiaslau) attended the convention.

10.  Minutes of the Second General Convention of the Byelorussian Autocephalic Orthodox Church held on May 27, 28 and 29, 1972 in the Church of St. Mary of Zyrovicy, Highland Park, New Jersey, U.S.A.

The minutes detail the deliberations by the convention delegates about the formation of a Constitution for the BAOC. On May 28, 1972, the convention adopted the following proposal:

> That the convention accept the constitution of the BAOC in principle and delegate to the constitutional commission the task of formulating its contents, form and language in conformance to the spirit of the convention and with consultation of the delegates to today's convention and through a referendum.

All of the witnesses during the trial agreed that a Constitution [11] was only adopted in principle at the convention. A referendum was to follow after acceptable language had been agreed upon. Page 3 of the minutes also indicates that "Archbishop Andrew was elected as primate of the BAOC, hereinafter known as Metropolitan Andrew."

Work on the precise language of the Constitution continued over the next several years. On August 20, 1975, Andrew appointed Reverend Makeim Taupieka to serve as the priest for the Holy Spirit Church. Although it appears that Mikalay played an instrumental role in the appointment of Taupieka, the Holy Spirit Church accepted Andrew's ultimate authority to designate a priest. Indeed, Paragraph 5 of the Holy Spirit Church By Laws indicate that the authority rested only with Andrew.[12] The Defendants' apparent assertion (to wit, that the Holy Spirit Church actually had the essential authority over the appointment of the priest) is belied by the statements of Plezkacz who repeatedly said that he lacked any authority to oust Taupieka. He opined that only Andrew had such power.

The Statute was ultimately promulgated with a January 1, 1976 effective date.[13] The Statute was signed by Andrew, Kendysh, and Vasil Rusak, as the Secretary of the BAOC convention. The Defendants assert that the Statute was improperly promulgated because it was never sent to the delegates for a referendum as required by the convention. Kendysh essentially admits this point, arguing only that the Holy Spirit Church and the other parishes, in failing to express any objections, acquiesced in the adoption of the Statute. This Court agrees with the Defendants and finds the evidence to be conclusive that no referendum was ever held on the Statute.[14]

According to the Statute, all local statutes of the parishes and dioceses were immediately cancelled and lost their effectiveness on January 1, 1976. Under Paragraph 29 of the Statute, control of local property was handled by the trustees:

> The purchase or disposition of church real estate/property, land and buildings are to be carried out by trustees. (At least three persons) when property of the Consistory is involved, the latter appoints the trustees. In the Diocese, trustees are elected by the Diocesan Convention, in the Parish, by a meeting of the parishioners.... Trustees carry out transactions of purchase or sale in the name of the BAOC, as stated in paragraph 107 of these statutes ...

The property under control by the parishes become the property of the BAOC, as set forth in Paragraph 98 of the Statute:

> All real estate, land, church buildings, chapels, other buildings, cemetaries, as well as all movable property and invento-

---

**11.** The Constitution was entitled "Statute of the Byelorussian Autocephalous Orthodox Church."

**12.** Paragraph 5 of the By Laws reads:
5. Beside the parish priest, depending on the needs and financial resources of the parish, there can be more priests, deacons and psalmists. All priests are appointed by the Ruling Bishop of B.A.O.C. who has jurisdiction over the parish. The clergy and other personnel of the parish help organize and conduct the Parish activities under the supervision of the parish priest.

**13.** Paragraph 113 of the Statute reads:
The principles of these Statutes were accepted by a decision of the General Convention of the Byelorussian Autocephalous Orthodox Church in the Church of Holy Mother of Zyrovicy, Highland Park, N.J. on May 28, 1972, and put into operation with the signing of the official copy on the first day of January of the year nineteen hundred and seventy six.

**14.** The validity of the Statute is discussed, *infra.*

ry—purchased or donated—funds in bank accounts or cash in current use under the authority and management of the Consistory, Dioceses, Parishes, Missions, and Monasteries which belong to BOAC jurisdiction is incontestably the property of the Byelorussian Autocephalic Orthodox Church.

Under the provisions of Paragraph 54 of the Statute, the Consistory became the Church body with supervisory authority over church assets:

The duties of the Consistory include: (a) Execution of decisions passed by the BAOC General Convention, Council of Bishops and BAOC Council; (b) Close contact with Dioceses and Parishes; (c) Fund raising and preparation of an annual budget proposal for the BAOC; (d) Maintenance of strict accounting for the real estate and property of the BAOC; (e) Keeping a roster of BAOC clergy; (f) Actual conduct of negotiations and other formalities connected with the purchase or sale of real estate and land, following the decision of the BAOC Council in the matter; (g) Intercession for and defense of BAOC interests whenever needed.

In certain circumstances, the Consistory acquired the authority to take direct control of all parish assets, as evidenced by Paragraph 110 of the Statute which reads:

Liquidation of a Mission, Monastery or Parish can occur only with the consent and order of the Consistory. When the necessity arises to liquidate or to transfer them to a jurisdiction other than that of the BAOC, all real estate property, land, church edifices, and other buildings with furniture and all movable inventory as well as books, documents and archives, bank accounts, and cash money, any and all property that has been under the authority of said institutions, the Mission, Monastery, or Parish, automatically comes under the direct authority of the Consistory as property of the BAOC.

Paragraph 111 of the Statute states:

At the time when a resolution is passed at the General Meeting to liquidate, or to transfer to other than the BAOC jurisdiction, a Mission, Monastery, or Parish, no person or institution within the affected unit has the right to prepare or sign deeds or other documents of purchase or sale of land, church building or other buildings, or any other Church property, nor otherwise can anyone sell or take anything of Church property to his home or anyone else's home, or to give it away to anyone else, nor can anyone in the name of the liquidated unit enter into agreements with other organizations, associations, corporations, or institutions. Anyone breaking this rule is accountable before a court of law.

Within the BAOC structure, as portrayed in the Statute, the primate is the spiritual leader and the chief ecclesiastical officer who presides over the dioceses. In 1978, the BAOC split into an American and Canadian Diocese. The American Diocese has jurisdiction over the local churches in the United States. The Canadian diocese has jurisdiction over parishes in Canada and Europe. Each diocese is presided over by a governing bishop who has the ecclesiastical and administrative authority over the parishes within his diocese. When created, Andrew headed the American Diocese and Mikalay headed the Canadian diocese. Each parish in a diocese has a pastor, who is appointed by the governing bishop, and a parish council which has the custodial supervision over parish property. Within this diocesan structure, the parishioners and their parish council are ostensibly fully subordinate to the authority of their governing bishop. The chief ecclesiastical judicatory is the Council of Bishops which is chaired by the primate.

The trial record demonstrated a repeated recognition of the power of the Statute by the Holy Spirit Church. For example, the Plaintiff's Exhibit 5 is a letter, dated February 12, 1976, from the Chairman of the Holy Spirit Church Parish Council to the BAOC Consistory in which he reports the results of the then-most recent BAOC parish election. The Holy Spirit Church also forwarded parishioner lists to the Consistory. The evidence in the record also indicates that no non-member parishes of the

BAOC took any similar action or showed any such devotion.

The Plaintiff's Exhibit 19 is a July 14, 1977 letter from Mikalay who advised Brucky to comply with the Statute. During the trial, Mikalay also acknowledged in the letter that he was not the Diocese head of the Holy Spirit Church, contrary to the views of the Holy Spirit parishioners. However, Mikalay, who claims to be the spiritual leader of the Holy Spirit Church, now contends that the Statute is invalid. Mikalay bases his changed position with regard to the authority of the BAOC and his position within the Holy Spirit Church on a recent discovery that no post-convention referendum was ever conducted. This "discovery" is somewhat troubling in view of the level of his involvement with the BAOC and the Holy Spirit Church, and his chairmanship of the Constitutional Committee. Despite this apparent awareness, Mikalay did not demonstrate any concern about the absence of a referendum for several years until the commencement of this lawsuit. Indeed, Mikalay acted as if he was bound by the Statute. Despite his contention, this Court believes that it was the schism between the parties to the instant lawsuit—not his recent discovery—which caused him to change his position regarding the Statute.

The Plaintiff's Exhibit 7 reflects the minutes of the BAOC Council which was held on May 22, 1977. Brucky attended the meeting on behalf of the Holy Spirit Church. No non-member parishes were present. The Plaintiff's Exhibit 9 records the assessments that were paid by the Holy Spirit Church to the Treasurer of the BAOC. This Court does not believe, as the Defendants contend, that these payments by the Holy Spirit Church were simply voluntary contributions to the BAOC. Indeed, the Plaintiff's Exhibit 15 provides a listing of dues paid by the various parishes, including the Holy Spirit Church, in 1978 and 1979. Although these payments were not large, this suggests that the Holy Spirit Church considered itself to be bound to the hierarchy at that time. In the Plaintiff's Exhibit 13, the notes from a BAOC Council meeting on May 20, 1979 indicate that there were fifteen active parishes, including Holy Spirit Church, in the United States at the time of trial.

The record at trial demonstrates a general obedience by the Holy Spirit Church to the BAOC from its inception until October 12, 1980 when the Holy Spirit Church requested Mikalay to take the parish under his control. However, Andrew rejected this action by the Holy Spirit Church sometime thereafter. In a September 1981 "Declaration," the members of the Holy Spirit Church Parish Council requested Andrew not to recognize Brucky as a BAOC bishop.[15] This document makes clear that the Holy Spirit Church, while demonstrating a strong allegiance to the BAOC, no longer recognized Andrew as its spiritual and administrative leader.

Kendysh produced several documents which indicate that the Holy Spirit Church saw itself as a full member of the BAOC. For example, Exhibit 17 is an affidavit of Bakunovich which was executed on May 10, 1982 wherein he avers "I am a duly

---

**15.** The Declaration read as follows:

Your Excellency, Metropolitan Andrew, we would like to declare herewith that the Parish of Holy Spirit BAOC in E. Detroit, Michigan does not recognize Rev. John Brucky as a Bishop of the Byelorussian Autocepalic Orthodox Church for the reasons as follows: Rev. Brucky was consecrated a Bishop in violation of the Statute of BAOC without the approval of the Council of the Bishops of BAOC; he was consecrated in violation of the canons of the Holy Orthodox Church. He was consecrated in secrecy from the faithful of the BAOC by an outside non-BAOC Metropolitan in an outside non-BAOC church.

Therefore, decisions of the so-called "Council of the Bishops" consisting of the Metropolitan of BAOC and the non-BAOC and the non-BAOC Bishop Isiaslau (Rev. J. Brucky) without participation of Archbishop of BAOC Mikalay are not binding to our Parish.
Archbishop Mikalay continues to be lawful Senior Hierarch of the BAOC. In response to the resolution and petition of the General Meeting of the Parish of Holy Spirit in E. Detroit, Michigan which took place October 12th, 1980, Archbishop Mikalay issued December 15, 1980 an Archbishopric order through which he took our Parish into his jurisdiction. The Parish considers Archbishop Mikalay its spiritual and administrative leader.

elected trustee of the Byelorussian Autocephalic Orthodox Church ... I have not resigned nor have been dismissed from that position and that I continue to serve in my capacity as a trustee." Several months later (November 15, 1982) and even after the schism, Bakunovich still sought to participate in the BAOC Council.[16]

According to Pleskacz, the first problem occurred when Taupieka refused to perform a liturgy with Mikalay. At a later time (February 1983), he refused to go to a conference in Cleveland, Ohio which involved dissident parishes. Taupieka subsequently left the Holy Spirit Church in April 1983.

Although Taupieka does not deny these contentions, he claims to have been forced out of his office (e.g., threatened with immigration problems, told that his services would not be needed, and advised that he would not be paid). Pleskacz has denied all of these allegations. Taupieka essentially admitted during the trial that he had no immigration difficulties. Moreover, Pleskacz and others testified that only Andrew could terminate a priest. Thus, it is highly unlikely he was told by Pleskacz that he would be terminated.

Finally, the record also appears to indicate that the Holy Spirit Church did not pay for his services after 1975, although this issue was left somewhat confused. Under these circumstances, it does not seem likely that the Holy Spirit Church could threaten to cut his expenses. However, it is crystal clear that Taupieka found the working environment at the Holy Spirit Church to be extremely difficult since he supported Andrew and the parishioners supported Mikalay.

Regarding the property sought by Kendysh, the evidence shows that the Holy Spirit Church had less than $40,000 deposited with MNB. Kendysh seeks these funds in addition to the two parcels of land to which reference has been made earlier.

The Defendants do not deny that Pleskacz voted along with the rest of the Holy Spirit Church membership to appropriate (a) $10,-100 for the purchase of a car for Mikalay between October 1980 and December of 1983, (b) $3,000 for his legal defense, and (c) $5,000 to two other parishes.

## CONCLUSIONS OF LAW

The first Supreme Court case to clarify the role that the courts should play in resolving church property disputes was *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 20 L.Ed. 666 (1872). In *Watson*, the Court noted that there were essentially three kinds of church property disputes; namely, those (1) where the deed expressly gives the property to some form of religious doctrine, (2) in which the property is given to an independent congregation, and (3) wherein the property involved a hierarchical church polity. *Watson* defined this third example as encompassing the situation:

> where the religious congregation or ecclesiastical body holding the property is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control more or less complete, in some supreme judicatory over the whole membership of the general organization.

*Id.* 80 U.S. (13 Wall.) at 722, 723.

*Watson* then adopted the "strict deference" approach in the hierarchial church cases, which directs the courts to defer to the decision of the highest church judicatory to which the matter has been carried. *Id.* at 727. The Court stated this was the only method that could result in a sound view of church-state relations and prevent state interference in church affairs. *Id.* For years, no other approaches were common.

However, in recent years, the Supreme Court has also endorsed the "neutral prin-

---

**16.** Exhibit 16 reads as follows:

It was brought to my attention that on November 6, 1982, you convoked the Council of Byelorussian Autocepalic Orthodox Church. For some reason, only known to you, you omitted six members of the Council for the BAOC including myself. Therefore, I strongly protest your action, and state that any decisions that took place at that illegal meeting are null and void.

ciples of law" approach to church property disputes. In *Presbyterian Church v. Hull Church*, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969), the Supreme Court rejected a state court approach that had inquired into church doctrine as a means of deciding which faction should be awarded the property in dispute. The Supreme Court concluded that such an approach would violate the First Amendment Clause which bars the "establishment" of religion. However, the Court stated that "neutral principles of law" could be used for deciding which faction had the property right.

This approach was further endorsed in *Jones v. Wolf*, 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979), when the Court stated that it was acceptable to decide the dispute:

> on the basis of the language of the deed, the terms of the local church charters, the state statutes governing the holding of church property and the provisions in the constitution of the general church concerning the ownership and control of church property.

*Id.* at 603, 99 S.Ct. at 3025. The Court noted that such an approach would (1) leave it unentangled in questions of religious doctrine and (2) allow private parties to structure their relationships with "appropriate reversionary clauses and trust provisions." *Id.*

All parties to the instant controversy agree that Michigan law is controlling in this diversity action case. *Erie Railroad Company v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Therefore, the first question to be addressed is what kind of relationship did the Holy Spirit Church have with the BAOC. The Holy Spirit Church contends that it is independent of the BAOC and, thus, Kendysh is not entitled to either of the properties. On the other hand, Kendysh disagrees, claiming that the Holy Spirit Church is a part of its hierarchy.

It is quite clear that the BAOC intended to have a hierarchial relationship with its parishes regarding all matters including property. As "hierarchial" was defined in *Watson v. Jones, supra,* the key inquiry is whether the congregation which holds the property is subordinate to "superior ecclesiastical tribunals with a general and ultimate power of control." Michigan law is in accord with this general definition of a hierarchial policy. *See e.g. Bennison v. Sharp*, 121 Mich.App. 705, 718, 329 N.W.2d 466.

The structure of the Church, as set out in the Statute, and discussed in the findings of fact, makes clear that the BAOC intended to control its parishes in almost every area, including priest appointments, doctrinal disputes, and property. A set of judicatries also exists going up to the Council of Bishops. Paragraph 98 of the Statute indicates that all of the property of the parishes, etc. belong to the entire church.[17] Although the parish had much day to day control, the ultimate control was with the hierarchy. Almost all courts agree that the Eastern Orthodox churches are hierarchially organized "with respect to spiritual or ecclesiastical authority ..." *See e.g.* Annotation, *Determination of Property Rights Between Local Church and Parent Church Body: Modern View*, 52 A.L.R.3d 324, 399 (1973).

Defendants disagree, asserting that the Statute is invalid. They argue that the 1972 convention, without any definitive language before it, decided to conduct a referendum after the appropriate language had been drafted. Thus, the Defendants submit that the absence of the requisite referendum invalidates the Statute.

The early Supreme Court decisions allowed an attack on the arbitrariness of the procedures that are employed by the hierarchical polity in making decisions with an impact on property rights. In *Gonzalez v.*

---

**17.** Paragraph 98 of the Statute reads:

All real estate, land, church buildings, chapels, other buildings, cemetaries, as well as all movable property and inventory—purchased or donated—funds in bank accounts or cash in current use under the authority and management of the Consistory, Dioceses, Parishes, Missions, and Monasteries which belongs to BAOC jurisdiction is incontestably property of the Byelorussian Autocephalic Orthodox Church.

*Roman Catholic Archbishop of Manila,* 280 U.S. 1, 16, 50 S.Ct. 5, 7, 74 L.Ed. 131 (1929), Justice Brandeis said, *in dicta,* that the decisions of the ecclesiastical authorities should be upheld unless they are the product of fraud, collusion, or arbitrariness. This would seem to provide a legal basis for the Defendants' attack on the Statute.

■ However, in *Serbian Eastern Orthodox Diocese for the United States of American and Canada, et al v. Milivojevich,* 426 U.S. 696, 713, 96 S.Ct. 2372, 2382, 49 L.Ed.2d 151 the Court rejected the Brandeis dicta. In *Serbian,* the Supreme Court held that an inquiry by the courts into the propriety or arbitrariness of ecclesiastical procedures is a prohibited judicial intrusion into the internal affairs of the church. *Id.* at 713–14, 96 S.Ct. at 2382–83. *Serbian,* in addressing the precise issue of when a church violates its own procedures, stated that it is not the role of the court to invalidate governing body decisions of the church. The case, which is currently before this Court, provides a classic example for the prohibitions of *Serbian.* If this Court declared the Statute to be invalid, it would destroy the centerpiece of the BAOC. In the absence of fraud, collusion, or lack of jurisdiction, the Court must defer to the hierarchy.

As *Serbian* points out, it is the nature of a hierarchical policy where pronouncements are undemocratically made that members of the church accept the pronouncements:

as matters of faith whether or not rational or measurable by objective criteria. Constitutional concepts of due process, involving secular notions of "fundamental fairness" or impermissible objectives, are therefore hardly relevant to such matters of ecclesiastical cognizance.

*Id.* at 714–15, 96 S.Ct. at 2383. Thus, the Statute is presumptively valid.

■ Even though the Statute establishes a hierarchical polity, it does not determine whether the Holy Spirit Church was a part of that polity. This Court believes that the so-called "living relationship test" is the best way to make such a determination without intruding into the realm of ecclesiastical decisions. This test was excellently summarized by one commentator who was supportive of its use:

It seems far preferable to look to the lines of church authority as they existed just before the dispute impaired them. Courts using this approach have emphasized such factors as whether the local organization accepted ministers appointed by diocesan executives, regularly sent delegations to denominational convocations, received financial assistance from the general church, or made payments to the funds of the general church. This inquiry has the advantage of directing the courts' attention to the prevailing understanding within the church and of eliciting difficult questions of the construction of ecclesiastical documents. Long-continued renunciation of hierarchical control should be conclusive of autonomy; conversely, acquiescence by the local congregation in the exercise of discipline and the management of its internal affairs by the hierarchy should preclude an assertion of autonomy.

Note, "Judicial Intervention in Disputes Over the Use of Church Property," 75 *Harv.L.Rev.* 1142, 1162 (1962). Michigan case law has impliedly adopted this approach as have the Ohio and Pennsylvania Supreme Courts. The crucial time of inquiry is the period "just before the dispute" arose.

In *United Armenian Church v. Kazanjian,* 322 Mich. 651, 658, 34 N.W.2d 510 (1948), the Michigan Supreme Court looked at factors such as whether the defendant attended church conventions, acted as a delegate, had expenses paid, etc., in determining whether she was affiliated with a particular hierarchy of the United Armenian Brethren Church. The court, in effect, looked at the living relationship of the parties. Thus, Michigan law is supportive of this approach.

In *State ex rel. Morrow v. Hill,* 51 Ohio St.2d 74, 364 N.E.2d 1156, 1158 (1977), the Supreme Court of Ohio explicitly adopted the "living relationship test" in affirming the analysis by the lower court:

In particular, the [trial] court considered that each member of the congregation took a vow to adhere to the national discipline; that the local church participated in national conferences by sending delegates; and that it provided officers in the national organization's government and generally followed prescribed national procedures in its day-to-day operations.

The Ohio Supreme Court cited *John Chrysostom Greek Catholic Church of Pittsburgh v. Elko*, 436 Pa. 243, 259 A.2d 419, cert. denied, 399 U.S. 920, 90 S.Ct. 2258, 26 L.Ed.2d 786 (1969), wherein the Pennsylvania Supreme Court relied upon the "continuous and active participation [of the local church] in the affairs of the national body until the dispute arose" to show the affiliation. *Id.*, 364 N.E.2d at 1159.

█ Based on these factors, this Court believes that the preponderance of the evidence clearly shows the Holy Spirit Church to have been a part of the BAOC hierarchy prior to the schism in October of 1980. As the findings of fact demonstrate, the Holy Spirit Church (1) accepted the primate's appointments of priests, (2) paid its dues, (3) kept the Consistory informed of parish elections, (4) transmitted lists of its parishioners, (5) had members who actively participated actively in BAOC affairs as officers, and (6) repeatedly invoked the BAOC Statute as the authority for its actions.

The Defendants argue that their autonomy is apparent because they consistently obeyed Mikalay whom they contend was truly responsible—not the BAOC—for getting Taupieka as a priest. This argument must be rejected because Kendysh introduced a substantial amount of evidence which demonstrated that Mikalay was emotionally devoted to the BAOC until the schism between the parties in 1980. As an example, in Plaintiff's Exhibit 19, Mikalay wrote to Brucky, urging him to comply with the BAOC rules:

It is necessary to keep in mind that the head (head of parish) of the Holy Spirit Parish in Detroit is Rev. Maksim Taupieka, and that the governing bishop is Metropolitan Andrew. I am only for Canada.

This Court does not accept the Defendants' assertions that their payments to the BAOC were only gifts—not dues or assessments. The facts indicate that, like all the parishes, the Holy Spirit Church saw itself as being obliged to help fund the BAOC hierarchy. Clearly, the Holy Spirit Church was a part of that hierarchy. Although the Articles of Association indicate that the Holy Spirit Church is not governed by a higher ecclesiastical authority, this evidence is offset by (1) Paragraph Fourth which reads, in part, that "[t]he members of said church or society shall worship and labor together according to the discipline, rules and usage of the Holy Apostolic Oecumenical Orthodox church in the United States of America," and (2) its By Laws which clearly indicate an obedience to the BAOC. Moreover, the Michigan Supreme Court has determined that where a local parish's articles of association are in conflict with a controlling church order, the articles are void on that point. *See e.g. Second Protestant Reformed Church v. Blankespoor*, 350 Mich. 347, 352, 86 N.W. 2d 301 (1957). *See generally*, 52 A.L.R.3d at 354 (and cases cited therein). Above all, the "living relationship" shows the hierarchical relationship.

Inasmuch as it has now been determined that the Holy Spirit Church is a part of the BAOC hierarchy, the next question is whether their relationship contemplated the release of title, interest in, and possession of, the properties to the BAOC in case of a schism. In *Bennison v. Sharp*, 121 Mich. App. 705, 718, 329 N.W.2d 466 (1982), it was determined that Michigan courts have the authority to employ either the "neutral principles" or the "strict deference" approaches to resolving hier-archical property disputes. Under the "strict deference" approach, Kendysh is entitled to all of the property that is currently in the possession of the Holy Spirit Church because the Consistory has asserted its authority as a judicatory of the Church.

█ Under the "neutral principles" approach, the Court must make a secular

analysis of all relevant documents such as national church charters, local by laws or articles, relevant deeds, significant state statutes, etc. According to the Statute, Paragraph 98 makes clear that all property belonging to the parishes "is incontestably the property of the Byelorussian Autocephalic Orthodox Church." As noted earlier, Paragraph 113 cancelled the local statutes of the parishes and dioceses. Having already determined that it cannot evaluate the validity of the Statute, this Court concludes that it must defer to the hierarchy on this point. Therefore, any provisions within the Articles of Association and/or the By Laws of the Holy Spirit Church which state that property can be disposed by the parishioners are nullified by this superior authority.[18]

█ Indeed, there is a strong presumption that where there is a hierarchical polity and the governing constitution provides that all property ultimately resides with the national church, a "neutral principles" analysis will result in the property being held in trust by the local for the national church. One commentator has written:

> The fact that the local church's charter or other documents contained provisions inconsistent with hierarchical control of local property or was amended to have this significance, and the fact that the church property in question was paid for entirely out of funds raised by the local congregation, and not with any financial help from the denomination, have been held to have no effect on the rule that the parent body of a hierarchical church has the right to control local church property.

52 A.L.R.3d at 335. *See also Second Protestant Reformed Church,* 350 Mich. 347, 86 N.W.2d 301 (inconsistent provisions regarding property); Note, 75 *Harv.L.Rev.* at 1163–64 (the fact that local funds built church property is ordinarily a "neutral factor" regarding autonomy).

█ It is true that the deeds identify the Holy Spirit Church as the owners of the properties. However, such an identification is not inconsistent with Kendysh's position that the Holy Spirit Church holds the property in an implied trust for the BAOC. In *Fuchs v. Meisel,* 102 Mich. 357, 371, 60 N.W. 773, the Supreme Court of Michigan stated that "it is immaterial in whom the legal title stands. One party may hold the title, and another be entitled to the use and possession of the property." Here, the documents and relationship show that the properties were held in trust for the national church even though they were initially bought by local parishioners.

The documents and the nature of the relationship of the parties fail to produce any evidence that the Holy Spirit Church was completely independent of the BAOC regarding its temporal matters prior to the schism. *See e.g. Colin v. Iancu,* 82 Mich. App. 521, 528, 267 N.W.2d 438 (review of the constitution determines to whom property is awarded in the event of a schism); 52 A.L.R.3d at 370 (acquiescence in the constitution by local church is enough to make it binding though never formally adopted). *Also see United Methodist Church v. St. Louis Crossing Independent Methodist Church,* 150 Ind.App. 574, 276 N.E.2d 916, 925 (1971) which determined:

> A local church, if it desires to remain independent of the influence of a parent church body, must maintain this independence in the important aspects of its operation—e.g., polity, name, finances. It cannot, as here, enter a binding relationship with a parent church which has provisions of implied trust in its constitution, by-laws, rules, and other documents pertaining to the control of property, yet deny the existence of such relationship. It does not matter whether such agreement to be bound is memorialized. A local church cannot prosper by the benefits afforded by the parent, participate in the functioning of that body, yet successfully disclaim affiliation when the parent acts to the apparent disadvantage of the local, so as to shield from equitable or

---

**18.** Even while utilizing the "neutral principles analysis," this Court must use strict deference when the relevant documents raise ecclesiastical matters. Deference requires a recognition of the hierachy's governing statutes.

contractual obligation the valuable property acquired by the local church either before or during such affiliation.

Those cases, in which the courts have found parishes entitled to retain the church property, are easily distinguishable. For example, in *Russian Orthodox All Saints Church v. Darin,* 222 Mich. 35, 192 N.W. 697 (1923), the governing constitution of the national church recognized the independence of the parishes on property matters. Nothing could be less true of the Statute here. Moreover, the parishes in *Darin* had the authority to select priests—unlike the factual situation here.

One of the strongest cases that the Defendants could have relied upon is *St. John's Greek Catholic H.R.O. Church v. Fedak,* 96 N.J.Super. 556, 233 A.2d 663 (1967). In that case, it was not clear with what national organization the parish was affiliated. Moreover, the priests served at the pleasure of the parish, and there was evidence of the parish's insistence on independence over a period of years. Here, there was no evidence of anything but obedience prior to the schism. The priests were appointed by the Metropolitan, and the parish by laws reflect an affiliation with the BAOC. Therefore, under the neutral principles analysis, this Court concludes that the Holy Spirit Church holds its properties in trust for the BAOC.

■ The Defendants raise two additional arguments which merit discussion. First, they rely upon Paragraph 70 of the Statute which requires new parishes to apply to the BAOC in order to become members of the hierarchy. However, since the Holy Spirit Church was an original participant in forming the BAOC, it cannot be described as a new parish. Hence, Paragraph 70 is not applicable to this controversy.

■ The Defendants' more substantive objection is that the Michigan Statute of Frauds, M.C.L.A. § 566.106, bars any obligation on their part to transfer the title to the BAOC. The Michigan Supreme Court has rejected the applicability of the Statute of Frauds to resulting (implied) trusts or constructive trusts over property. *See e.g. Thurn v. McAra,* 374 Mich. 22, 24–25, 130

N.W.2d 887 (1964); *Kent v. Klein,* 352 Mich. 652, 656, 91 N.W.2d 11 (1958). These cases also indicate that constructive trusts, in Michigan, arise not only when there is fraud in acquiring property interests but also "where property is unconscionably withheld." *Thurn v. McAra,* 374 Mich. at 26–27, 130 N.W.2d 887. The Statute of Frauds is clearly inapposite to this case. In finding an implied trust or a constructive trust, this Court is acting through its equitable powers by creating a remedy where none would otherwise exist. Under the circumstances of this case, the failure of the Defendants to promise in writing to hold the properties in trust as the Statute of Frauds would require is not relevant. *Kent v. Klein,* 352 Mich. at 656, 91 N.W.2d 11. Here, it is clear from the prior discussion that the Holy Spirit Church held the properties in trust for the BAOC.

■ Kendysh claims that Pleskacz breached his fiduciary duty to the BAOC by approving the expenditures of funds in the amount of $18,100 ($10,100 for an automobile, $3,000 for his legal defense, and $5,000 to two other dissident churches) to Mikalay without authority between October 12, 1980 and December 1983. Pleskacz does not deny having approved the payments, but contends that he (1) acted in the interest of the parish, and (2) was only one person among a unanimous parish who voted to make the payments.

This latter argument is unpersuasive. In *Pappas v. Moss,* 303 F.Supp. 1257, 1280 (D.N.J.1969), the Court stated:

A liability to make good on less resulting from a breach of trust participated in by more than one trustee is both joint and several so that each defendant is liable for the whole loss.

*Cf. In re Tolfree Estate,* 347 Mich. 272, 79 N.W.2d 629 (1956) (co-trustee could not escape from liability on the ground that he left it to the co-trustee to take action).

■ The first question which must be resolved is whether Pleskacz was acting as a fiduciary of BAOC. A fiduciary relationship exists where "there is special confidence reposed in one who in equity and

good conscience is bound to act in good faith and with due regard to interests of one reposing the confidence." *Neagle v. McMullen*, 334 Ill. 168, 165 N.E. 605 (1929). There is no doubt that the Holy Spirit Church held the church properties in trust for the BAOC. Thus, as an officer of the Holy Spirit Church, Pleskacz was an implied fiduciary for BAOC.

■ However, the more important question is whether Pleskacz breached any fiduciary duty. The general rule regarding a trustee who is expected to care for property is stated in M.C.L.A. § 700.813 which specifies that:

> the trustee shall observe the standards in dealing with the trust assets that would be observed by a prudent man dealing with the property of another, and if the trustee has special skills or is named trustee on the basis of representations of special skills or expertise, he is under a duty to use those skills.

M.C.L.A. § 700.813. The underlying presumption is an awareness by the trustee that he possesses the property of "another" and, thus, is expected to act accordingly. *See Henderson v. Sherman*, 47 Mich. 267, 11 N.W. 153 (1882) where the Court stated:

> Mr. Sherman *fully accepted* the office and he thereby made it his legal duty to exercise reasonable skill and diligence in the execution of the respective trusts specified in the deed. This was not done.

*Id.* at 275, 11 N.W. 153 (emphasis added). The instant case is distinguishable because Pleskacz never explicitly "accepted" any trust duty. As a matter of law, this Court implied a trust relationship between Pleskacz with the BAOC. However, an examination of the entire record suggests that he genuinely believed (1) the property to have been exclusively held for the parish and (2) his actions with regard to the expen-diture of money were done as an officer for the benefit of the Holy Spirit Church.

An analogy to the area of bailment law will show why this result is necessary:

> An involuntary bailee, as long as his lack of volition continues, is not under the slightest duty to care for the subject of the bailment, and cannot be held, in respect of custody, even for what would be the grossest negligence in the case of a voluntary bailment.

4 *Michigan Law and Practice*, "Bailment," § 6 at 45.

In the absence of any evidence that Pleskacz did not act in good faith with regard to the contested property interests, and inasmuch as his belief that the Holy Spirit Church alone controlled the dissemination of monies was reasonable under the circumstances, this Court concludes that Kendysh has failed to establish his burden of proof with regard to the breach of fiduciary duty claim. Moreover, it would be totally unfair for this Court to find Pleskacz violated a duty about whose existence he reasonably was unaware.

■ Finally, Kendysh claims that Pleskacz "evicted" Taupieka from the Holy Spirit Church. By analogy, this Court will rely upon the general legal standards, which govern evictions by landlords of tenants, to assist in the legal reasoning. M.C.L.A. § 600.2918 governs these kinds of evictions in Michigan. An action for eviction generally requires proof of an intent to evict. *Thompson on Real Property*, § 1132 at 493. All of the evidence indicates just the opposite. Pleskacz testified that he only wanted Taupieka to do the liturgy with Mikalay. Contrary to Kendysh's contention, the testimony reflects a desire by Pleskacz to work with Taupieka —not to evict him. There is also no persuasive evidence of any malicious intent by Pleskacz to retaliate against Taupieka because of his support of Andrew in the church dispute. In general, this Court finds Pleskacz' testimony (to wit, that he never threatened Taupieka) as being more credible than the opposition evidence.

Finally, Taupieka's allegations (to wit, he might lose his salary) were vague and unsubstantiated by any evidence. The evidence makes it appear that Taupieka left the Holy Spirit Church because of his disagreements over spiritual matters, and not because of the actions of Pleskacz. As a result, this Court concludes that Kendysh

has not proven his eviction claim by a preponderance of the evidence.

 Kendysh also seeks an accounting from the Defendants on the basis of the fiduciary relationship between the BAOC and the Holy Spirit Church. However, Kendysh has failed to assert that he ever requested an accounting from the Holy Spirit Church which was refused. Such allegations are usually required in the Complaint before a court will grant a claim for an accounting. *See generally Accounts and Accounting*, 1 Am.Jur.2d § 46 at 420 and 430. In addition, Kendysh made only the vaguest assertions at trial that there may be other property in the Defendants' hands about which he was not aware. Such assertions are inadequate. As a consequence, this Court will deny Kendysh's request for an accounting.

On the basis of the preceding analysis, this Court issues the following final order:

1. All causes of action against Pleskacz are hereby dismissed, with prejudice.

2. The Holy Spirit Church, its officers, employees, representatives, agents, and any other persons who are associated with the Holy Spirit Church, are enjoined and restrained from (a) diverting, assigning, releasing, appropriating, and/or transferring any funds, income, property, or revenues to any person or entity and/or for any use which has not been sanctioned by Kendysh, and (b) excluding, or attempting to exclude, any duly appointed pastors and deacons who have been selected by the BAOC through the governing Bishop of the American Diocese to serve the Holy Spirit Church.

3. The Holy Spirit Church shall convey all right, title and interest in and to the parcels of realty which have been more fully described in this Order,[19] and as specified in the Defendants' Exhibit C and D, to Kendysh, in his official capacity as an officer of the BAOC, within thirty (30) days of this Order.

4. MNB shall turn over, release and surrender to Kendysh, in his official capacity as an officer of the BAOC, all funds on account and assets of the Holy Spirit Church in its possession within thirty (30) days of this Order.

5. Kendysh's request for an accounting shall be denied without prejudice.

6. This represents a final Order of this Court.

IT IS SO ORDERED.

---

**19.** *See* this Order at 2 and accompanying footnotes 4 and 5.